**Nathan G. Wagner**
DATSOPOULOS, MacDONALD & LIND, P.C.
201 West Main Street, Suite 201
Missoula, Montana  59802
Telephone:  (406) 728–0810
Facsimile:  (406) 543-0134
Email:      nwagner@dmllaw.com


*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| ESTATE OF LOREN SIMPSON *et al*, <br><br> Plaintiff, <br><br> vs. <br><br> YELLOWSTONE COUNTY *et al,* <br><br> Defendants. | Cause No.: CV 15-0099-SPW <br><br><br> **PLAINTIFFS' STATEMENT OF DISPUTED FACTS** |

Plaintiffs Estate of Loren Benjamin Simpson (the Estate), Brenda Davis, Wanda Simpson, Kylie Smith and Nathan Lonsbery submit the following Statement of Disputed Facts in compliance with Local Rule 56.1(b).

**Verbatim Response to Plaintiff's Statement of Undisputed Facts:**

1.  On January 8, 2015, at approximately 4:20 p.m., Robinson and Rudolph, both Deputy Yellowstone County Sheriffs, were on duty together with the Sheriff's Office in the same vehicle. Rudolph Affidavit, p. 1; Robinson Affidavit, p. 1.

    *Undisputed.*

2.  They were on the day shift.   Rudolph Affidavit, p. 2;   Robinson Affidavit, p. 2.

    *Undisputed.*

3.  They were both in uniform in a marked patrol vehicle. They were easily identifiable as law enforcement officers both by their uniforms and vehicle. Rudolph Affidavit, p. 2; Robinson Affidavit, p. 2.

    *Disputed.  The Defendants have submitted no evidence to demonstrate that Simpson was aware he was being followed by law enforcement officers. Simpson does not attempt to elude Robinson or Rudolph.  At no time did the officers engage the lights or sirens on their vehicle to give Simpson notice of their intent to initiate a traffic stop until AFTER they had shot Simpson.  Simpson Video, Pt. 2 16:19:42 – 16:40:03.*

4.   They saw a vehicle that matched the description of a stolen vehicle. Simpson Video, Pt. 2 16:19:42.

*Disputed.   Robinson and Rudolph were not sure the vehicle they were following was the same vehicle that had been reported stolen.   While following the vehicle, Robinson tells his supervising officer Ketch, with whom he is speaking by cell phone, "No I can't see shit.  I'm not even 100% sure it's the car…"  Simpson Video, Pt. 2 16:23:30 – 16:23:40.*

5.   They began to follow the vehicle. Simpson Video, Pt. 2 16:19:43.

*Disputed as to the implication that they were following the vehicle in an attempt to initiate a traffic stop, or that Simpson was aware he was being followed by law enforcement.   For much of the time Robinson and Rudolph were following Simpson, there were other vehicles between them and Simpson.   Even after the other vehicles turned off the road, Robinson and Rudolph did not close the distance on Simpson's vehicle, and did not turn on their lights or sirens.  Simpson Video, Pt. 2 16:19:43 – 16:24:57.*

6.   Before they could stop the vehicle, their vehicle became stuck in the snow on the road. They extricated their vehicle from the snow. Simpson Video, Pt. 2 16:23:20.

*Disputed as to the implication that Robinson and Rudolph were attempting to initiate a traffic stop or otherwise attempting to stop Simpson's vehicle.*

*Robinson and Rudolph followed Simpson at a distance, without turning on their lights or sirens, and instead of initiating a traffic stop, they discussed when and how they would retrieve their AR-15 and their 12 gauge shotgun. Simpson Video, Pt. 2 16:19:43 – 16:24:57.*

7.    They had been advised by a person that helped them extricate their vehicle that the road they were on was the only way to exit the area. Rudolph Affidavit, p. 3; Robinson Affidavit, p. 3.

      *Undisputed.*

8.    They waited for the vehicle to return. They parked their vehicle in the road. Simpson Video, Pt. 3 16:33:03.

      *Disputed.  Robinson and Rudolph did not "park their vehicle in the road." After learning that the road was a dead end and that Simpson would have to drive back down the road towards them, Robinson and Rudolph moved their vehicle into the middle of a one-lane rural road so as to form a roadblock.  Compare Simpson Video, Pt. 2 16:22:44 with Simpson Video, Pt. 3, 16:31:39.  See also Ernie Burwell Expert Report, page 3, submitted as **Exhibit 1**:*

> *After the patrol car was pulled out of the snow bank by some teenagers, Deputy Rudolph positioned the car where no other vehicles could pass.  The patrol car was blocking the roadway where no other vehicles would be able to pass.*

> *Mr. Burwell also submitted screenshots with his Expert Report showing the view from the forward-facing camera on the patrol car.  These screen shots*

demonstrate that the patrol car has been moved from the left side of the roadway—which would allow other vehicles to drive past—to the center of the roadway—which would not allow other vehicles to drive past.  Burwell Expert Report, page 4.  (See **Exhibit 1**).

When Robinson was questioned by Detective Fritz as to why they didn't just drive back down to Pryor Creek Road and wait for the vehicle to come down the road so they could initiate a traffic stop, Robinson admitted the reason was "[w]e've got him bottled up…there's nowhere else to go.  He's gonna have to come to us."  Yellowstone County Doc. 216 (See select Yellowstone County Documents submitted as **Exhibit 2**).

9.    To prepare for the vehicle's return, they armed themselves with their long guns, a shotgun and a military style semi-automatic rifle. Simpson Video, Pt. 3 16:35:54.

Disputed as to the implication that there was any need or justification for retrieving the AR-15 and the 12 gauge shotgun.  Robinson and Rudolph had no contact with Simpson prior to the time they shot him, and thus they had no reason to believe he was armed, that he posed any danger to them, or that he posed any risk of flight.  Simpson Video, Pt. 2 entire video; Simpson Video Pt. 3, 16:31:39 – 16:38:15.  The Defendants have admitted in discovery that "prior to the shooting of Loren Simpson, neither Deputy Robinson nor Deputy Rudolph had any

knowledge that Loren Simpson was carrying or armed with a weapon." *Yellowstone County's Discovery Responses submitted herewith as* **Exhibit 3**, *Request for Admission No. 3.*

10.    The vehicle approached them. Simpson Video, Pt. 16:37:59.

      *Undisputed.*

11.    They exited their vehicle with their weapons at the ready.  Simpson Video, Pt. 3 16:38:12.   They repeatedly ordered the vehicle to stop with their weapons pointed in the direction of the vehicle.   Simpson Video, Pt. 3 16:38:15.

      *Disputed as to the implication that Simpson could hear the oral statements made by Robinson and Rudolph.  The windows on the vehicle were rolled up because of the cold and snowy conditions, and there is no evidence that Simpson could hear Robinson or Rudolph's instructions.  Simpson Video, Pt. 3 16:38:14 – 16:38:18.  In addition, because Robinson and Rudolph failed to activate their overhead lights, there is no evidence that Simpson was even aware that Robinson and Rudolph were law enforcement officers.  Robinson and Rudolph violated Yellowstone County Sheriff's Office Policy 3-3(III)(D) which provides that "upon initiating a pursuit, deputies will immediately activate emergency lights, headlights and sirens."  Yellowstone County Doc. 1075-1077.  (See* **Exhibit 2**).

12.   The vehicle did not immediately attempt to stop. Simpson Video, Pt. 3 16:38:15.

*Undisputed.*

13.   The vehicle began to veer in the direction of Robinson. Simpson Video, Pt. 3 16:38:16-18.

*Disputed.  The video clearly depicts Simpson attempting to avoid crashing into Robinson and Rudolph.  Simpson Video, Pt. 3 16:38:14 -16:38:18.  Former Deputy Robinson, former Deputy Rudolph, Detective Bancroft and Detective Fritz all agree that the video shows Simpson attempting to avoid hitting Robinson and Rudolph.*

*When Robinson was interviewed by Detectives Bancroft and Fritz and he shown the video of the shooting, Robinson stated during his interview as follows:*

> *And when I first saw the video it shocked me because I didn't—when I'm watching the video it looks like he's trying to drive past me.*

*Yellowstone County Doc. 195.  (See Exhibit 2).*

*Later during this same interview, Detective Bancroft and Robinson had the following exchange:*

> *Bancroft: Ok.  Hang on Fritzy before you forward it.  So we're clear would you agree when we look at the video from this two dimensional angle it looks like it's going away from you instead of in front of you?*
>
> *Robinson: At this point yeah it does.*

*Yellowstone County Doc. 206.  (See Exhibit 2).*

Likewise, when Detectives Fritz and Bancroft interviewed Rudolph and showed him the video, Detective Bancroft and Rudolph had the following exchange:

> Bancroft:  Would you <u>unintelligible</u> (probably "agree that in") this video the vehicle appears to be going around Deputy Robinson not at him at this point?
>
> Rudolph:  At this point yes, uhm ...
>
> ***
>
> Bancroft:  And when he was—when you see the video now it appears he was going around Deputy Robinson not at him at that time exactly?
>
> Rudolph:  Yeah it looks like he could have been going around us.

Yellowstone County Doc. 274-275.  (See **Exhibit 2**).

Detective Fritz's report of his investigation contains the following findings with regard to the video of the shooting:

> It appeared Deputy Robinson fired his patrol rifle first and was off set at an approximate thirty to forty degree angle to the vehicle.  It should be noted this was a visual approximation only.  Without any point of reference from Deputy Robinson to the vehicle Detective Fritz was unable to give an exact angle.

Yellowstone County Doc. 69.  (See **Exhibit 2**).

Expert Witness Ernie Burwell has also reviewed the video and has submitted the following statement in his Expert Report:

> Deputy Robinson and Deputy Rudolph used excessive, unreasonable and unnecessary force when they shot and killed Loren Simpson. Simpson was not a threat to the deputies.  Simpson did not try to run

*over the deputies as they describe.  In fact, Simpson tried to avoid hitting the deputies by running the vehicle into a snow bank.*

*Ernie Burwell Expert Report, page 5.  (See **Exhibit 1**).*

Robinson believed that the driver of the vehicle intended to strike him with the vehicle. Simpson Video, Pt. 3 16:38:19.

*Disputed.  As set forth in paragraph 13 above, no reasonable person in Robinson's position would have believed that Simpson intended to strike Robinson with the vehicle.  Robinson admits that the video shows the vehicle was not attempting to strike him, but rather to go around him.  Yellowstone County Doc. 195.  (See **Exhibit 2**).  Detective Bancroft states that the video shows the vehicle going away from Robinson rather than at him.  Yellowstone County Doc. 206. Rudolph admits that the video shows the vehicle was attempting to go around Robinson.  Yellowstone County Doc. 274-275.  (See **Exhibit 2**).  Detective Fritz states that the video depicts Robinson firing from a 30 to 40 degree angle, rather than directly into the front of the vehicle.  This demonstrates that the vehicle was not on a collision path with Robinson. Yellowstone County Doc. 69.  (See **Exhibit 2**).  Finally, Expert Witness Ernie Burwell has reviewed the video and has opined that the vehicle was attempting to avoid hitting Robinson by driving into the snow bank on the side of the road.  Ernie Burwell Expert Report, page 5.  (See **Exhibit 1**).*

14.    Because Robinson believed that driver intended to strike him with the vehicle he believed that he was in threat of death or seriously bodily injury from the driver. He began to fire his military style semi-automatic rifle at the vehicle to protect himself. Simpson Video, Pt. 3 16:38:20-21.

*Disputed.    As set forth in paragraphs 13 and 14 above (which are incorporated herein by reference), no reasonable person in Robinson's position could have believed that the vehicle posed a threat of death or serious bodily injury to Robinson.  The video is clear and there is no question that the vehicle was not going to strike Robinson.*

15.    Rudolph believed that the driver of the vehicle intended to strike Robinson with the vehicle. Simpson Video, Pt. 3 16:38:19.

*Disputed.    As set forth in paragraphs 13 and 14 above (which are incorporated herein by reference), no reasonable person in Rudolph's position would have believed that the vehicle was a danger to Robinson.  Rudolph has admitted that the video shows that the vehicle was not attempting to strike Robinson, but rather attempting to avoid hitting him.*

16.    Because Rudolph believed that the driver intended to strike Robinson with the vehicle, he believed that Robinson was in threat of death or seriously bodily injury from the driver. He began to fire his shotgun at the vehicle to protect Robinson.  Simpson Video, Pt. 3 16:38:21.

*Disputed.  As set forth above (and incorporated herein by reference), no reasonable person would have believed Robinson was in danger of death or serious bodily injury from the vehicle, because it is undisputed that the vehicle was attempting to avoid hitting Robinson.*

17.    Within seconds, Robinson and Rudolph fired numerous shots into the vehicle. Simpson Video, Pt. 3 16:38:22-25.

*Undisputed.*

18.    The vehicle swerved into a snow bank on the side of the road. The engine of the vehicle revving. Simpson Video, Pt. 3 16:38:25.

*Disputed as to the implication that the vehicle started to swerve towards the snow bank after Robinson and Rudolph fired on it.  The video clearly shows that the vehicle turned away from Robinson and Rudolph prior to Robinson's first shot. Simpson Video, Pt. 3 16:38:15 – 16:38:16.  After Robinson and Rudolph began firing at the vehicle, the front of the vehicle followed a straight path into the ditch/snowbank on the side of the road.   Simpson Video, Pt. 3 16:38:16 – 16:38:18.*

19.    Robinson and Rudolph waited a few seconds to make sure the vehicle did not back up before they approached the vehicle and turned off the vehicle. Simpson Video, Pt. 3 16:38:26-16:39:37.

*Disputed.  There is no indication that the vehicle ever attempted to back up. Detective Fritz asked Robinson if the vehicle's reverse lights ever came on, and Robinson answered as follows:*

> *Fritz:  Did you ever see the reverse lights come on?*
>
> *Robinson:  No.*
>
> *Fritz:  So the wheels were spinning forward?*
>
> *Robinson:  Yeah.*

*Yellowstone County Doc. 203.  (See **Exhibit 2**).*

*Detectives Bancroft and Fritz later verified that the reverse lights on the vehicle were operational.*

*Yellowstone County Doc. 48.  (See **Exhibit 2**).*

20.   There was one person in the vehicle, later identified as Loren Simpson, who had been shot several times and appeared dead. Rudolph Affidavit, p. 4; Robinson Affidavit, p. 4.

   *Undisputed.*

21.   They requested medical assistance. Simpson Video, Pt. 3 16:38:51. Medical assistance arrived at the scene and pronounced Simpson dead. Rudolph Affidavit, p. 4; Robinson Affidavit, p. 4.

   *Undisputed.*

22. Robinson and Rudolph's vehicle had an audio video camera. Simpson Video, Pt. 3 16:37:59-16:39:37. The camera recorded their encounter with Simpson. Simpson Video, Pt. 3 16:33:00. Robinson and Rudolph have watched the recording. It is an accurate account of what occurred. Rudolph Affidavit, p. 4; Robinson Affidavit, p. 4.

   *Undisputed*.

23. The County has agreed to defend and indemnify Robinson and Rudolph. When they shot and killed Simpson, they were acting within the course and scope of their employment with the County. Gillen's Affidavit, p. 2.

   *Undisputed*.

### Plaintiffs' Additional Facts in Opposition to Defendants' Motion and in Support of Plaintiffs' Cross-Motion:

25. On January 8, 2015, Robinson and Rudolph were investigating a report of a vehicle that had been stolen from a used car dealership in Billings, Montana. Yellowstone County Doc. 78. (See **Exhibit 2**).

26. The owner of the used car lot advised Robinson and Rudolph that the stolen vehicle was worth about $1,000.00. Yellowstone County Doc. 78. (See **Exhibit 2**).

27. This amount is less than the $1,500.00 threshold for felony offenses under Mont. Code Ann. § 45-6-301(8)(a), and as a result, Robinson and Rudolph

were aware they were investigating a misdemeanor theft rather than a felony offense.  Yellowstone County Doc. 78.  (See **Exhibit 2**).

28.    Later that day, Robinson and Rudolph were dispatched to a burglary call on Justice Trail in Huntley, Montana.  The burglary was not a "hot burglary" meaning that the homeowner believed the burglar was still in the home, but rather a "cold burglary" meaning the homeowner had arrived home and found her house open and items missing, but no burglar was in the house.  Yellowstone County Doc. 232-233.  (See **Exhibit 2**).

29.    As a result, the Defendants were aware that there was no ongoing felony offense being committed at the Justice Trail burglary location.  Yellowstone County Doc. 85, paragraph 3.  (See **Exhibit 2**).

30.    The burglary turns out to have not been a burglary at all, but rather a domestic dispute involving a man taking disputed items from his estranged wife's home.  Yellowstone County Doc. 85-86.  (See **Exhibit 2**).

31.    While on the way to the unrelated cold burglary call, Robinson and Rudolph observed a vehicle that they suspected might be the stolen vehicle they had been investigating earlier in the day.  Yellowstone County Doc. 163-164.  (See **Exhibit 2**).

32.  Robinson and Rudolph followed the vehicle and "watch[ed] it from a distance" without turning on their lights or siren.  Yellowstone County Doc. 164.  (See **Exhibit 2**).

33.  Robinson and Rudolph activated the dashboard camera on their patrol vehicle as they were following the vehicle.  Within the first minute after they began to follow the vehicle--without having observed any illegal or even suspicious conduct—Robinson and Rudolph have the following conversation:

>       Rudolph:     Do you want your shotgun or your AR?
>
>       Robinson:    I'll get my AR when I can.

Simpson Video, Pt. 2 16:20:50 – 16:20:54.

34.  There is no explanation offered as to why Robinson and Rudolph were discussing deploying an AR-15 patrol rifle or a 12 gauge shotgun as part of a misdemeanor stolen vehicle investigation.  Simpson Video, Pt. 2 16:20:50 – 16:20:54.

35.  While following the suspected stolen vehicle, Robinson and Rudolph never engaged their overhead lights, turned on their siren, or gave any other indication to the driver of the vehicle that they wanted him to pull over. Simpson Video, Pt. 2 16:20:50 – 16:24:57.

36.    As Robinson and Rudolph continued to follow the suspect vehicle up White Buffalo Road, their vehicle begins to lose traction in the snow.  When Robinson and Rudolph were unable to go any further, they stopped and backed a short distance down the road, eventually becoming stuck in the snow.  After Rudolph gets the vehicle stuck, Robinson says "I really want to go hiking up there" and Rudolph asks if they can commandeer a four-wheel drive vehicle.  Simpson Video, Pt. 2 16:24:00—16:24:57.

37.    Robinson and Rudolph appear highly emotional during this portion of their investigation.   On this portion of Robinson's third dash camera video, Robinson can be heard telling Rudolph:

That's what these little fuckers do.  They go steal cars, just like I said, they go steal cars, and then they go break into shit, and throw their stolen shit in those cars.  Now they're in the middle of fuckin' nowhere.

Simpson Video, Pt. 2 16:33:35 – 16:33:40.

38.    While being interviewed by Detectives Fritz and Bancroft after the shooting, Robinson stated:

I became a cop for one reason and that's to catch bad guys. This is somebody in a stolen car.  That's, that's a bad guy, ok? And I wanted to catch him.  I was excited to catch him.  That's what I wanted to do.  And so we were kind of nervous waiting to see what was gonna happen and thought "Oh cool, we're gonna—we're gonna take down a car thief today."

Yellowstone County Doc. 191-192.  (See **Exhibit 2**).

39.    While Robinson and Rudolph were stuck, another vehicle being driven by a local teenager and his friends who were returning home from school pulled up behind Robinson and Rudolph, and the teenagers helped free the vehicle from the snow.  Yellowstone County Doc. 142, 4th paragraph.  (See **Exhibit 2**).

40.    While this was taking place, Robinson asked if the youths lived in the area. When the youths indicated that they lived further up White Buffalo Road, Robinson asked if there was any other way to drive out of the area, or if the vehicle would have to come back down the same way he went in.  The youths informed Robinson that there was no other way out.  Robinson then obtained the teenager's cell phone number and then sent the teenager up the road, asking them to keep a look out for the suspected stolen vehicle. Yellowstone County Doc. 142, 5th paragraph.  (See **Exhibit 2**).

41.    Robinson and Rudolph then positioned their vehicle as a roadblock in the middle of the single lane snow-covered road, and began to prepare their AR-15 and 12 gauge shotgun.  Yellowstone County Doc. 142, 6th paragraph (See **Exhibit 2**); Simpson Video Pt. 3, 16:31:39 – 16:33:00.

42.    Rudolph can be heard on the video of the incident stating "I sent [Deputy] Leonhardt a message, and [Deputy] Ketch a message: Only one way in." Simpson Video Pt. 3, 16:32:48 – 16:32:52.

43.     After a few minutes had passed, Robinson called the cell phone number for the teenager, and the teenager reported that the vehicle was coming back down the road towards Robinson and Rudolph's position.  Simpson Video, Pt. 3, 16:34:49 – 16:35:18.

44.     Rudolph can be heard asking Robinson how to remove the 12 gauge shotgun from its mount in the vehicle, and then he can be heard loading three rifled slugs into the magazine in place of the 00 buckshot that had been left in the 12 gauge shotgun.  Robinson retrieves his AR-15 rifle from the trunk of the vehicle and he can be heard checking the magazine and loading a round into the chamber.  Simpson Video, Pt. 3, 16:35:20 – 16:36:42.

45.     During the 12 minute span of time from when the teenagers arrived to help free the officers from the snow drift at the end of the first video clip (Simpson Video, Pt. 2 16:24:57) until Robinson and Rudolph prepare the AR-15 and the 12 gauge shotgun (Simpson Video, Pt. 3 16:36:42), there is no discussion whatsoever of any less-lethal way to initiate a traffic stop of the suspected stolen vehicle.

46.     Robinson stated that the reason he didn't want to drive back down to Pryor Creek Lane because "we've got him bottled up" and "there's nowhere else to go.  He's gonna have to come to us."  Yellowstone County Doc. 216. (See **Exhibit 2**).

47.    At around 4:40 p.m., the vehicle being driven by Loren Simpson returned back down White Buffalo Road near the intersection with Shooter's Bluff Trail.  The vehicle was moving at a normal rate of speed for the conditions, and was not breaking any laws.  Simpson Video, Pt. 3 16:37:54.

48.    At this time, Robinson and Rudolph did not know who was driving the vehicle, how the driver came to be in possession of the vehicle, or even if it was the same vehicle that had been reported stolen earlier that day.  Simpson Video, Pt. 2 16:23:35 – 16:23:35.

49.    Despite having no basis to believe the driver of the vehicle had committed any crime other than misdemeanor possession of a stolen vehicle, Robinson and Rudolph left their vehicle positioned in the road as a roadblock and advanced towards the oncoming vehicle on foot with their AR-15 and 12 gauge shotgun deployed in ready positions.  Simpson Video, Pt. 3 16:38:08.

50.    Robinson and Rudolph did not activate their overhead lights or siren.  Simpson Video, Pt. 3 16:38:08.

51.    As the vehicle approaches the officers, it can be seen slowing down and hesitating before turning off the roadway to the right of Robinson and Rudolph.  As the vehicle moves to Robinson's right, Robinson can be seen moving further to his right, attempting to put himself in the path of the

vehicle as it attempts to avoid hitting him.  Simpson Video, Pt. 3 16:38:11 – 16:38:16.

52. As the vehicle continues off the road and away from Robinson and Rudolph, Robinson begins firing his AR-15 into the front of the vehicle at an angle of 30 to 40 degrees, and continuing to fire into the side of the vehicle as it goes past his position.   Simpson Video, Pt. 3 16:38:15 – 16:38:20.

53. After Robinson begins firing, Rudolph commences firing his 12 gauge shotgun into the vehicle, with his first round striking the windshield at an angle, and his second and third rounds entering the passenger side of the vehicle as the vehicle goes past his position.  Simpson Video, Pt. 3 16:38:15 – 16:38:20.

54. As the vehicle passed by Robinson, Rudolph had to stop firing and reposition himself Robinson was directly in Rudolph's line of fire towards the vehicle.  Rudolph can be seen lowering his 12 gauge, stepping to the side, and then re-deploying his 12 gauge from a different position.  Simpson Video, Pt. 3 16:38:18 – 16:38:20.

55. After Simpson's vehicle has come to rest facing perpendicular to White Buffalo Road, both Robinson and Rudolph continue firing into the back of the stopped vehicle.  Robinson fired 5 or 6 shots into the back of the stopped vehicle--including the fatal shot which struck Simpson in the back of the

head—and Rudolph fired three shotgun rounds into the back of the stopped vehicle.  Simpson Video, Pt. 3 16:38:18 – 16:38:21.

56.   Simpson was struck multiple times in the side of his body as he drove to the side of the officers, including a 12 gauge slug that entered his right shoulder, passed between his scapula and chest wall, through three of his ribs, and ultimately lodged under the skin by his left shoulder, and a .223 round from the AR-15 which penetrated his right side below his 8th rib and passed into his liver.  Yellowstone County Doc. 354 – 355.  (See **Exhibit 2**).

57.   After his vehicle came to rest in the ditch, Simpson was struck at least one additional time in the back of the head which would have been immediately incapacitating and ultimately fatal.  Yellowstone County Doc. 354 – 355. (See **Exhibit 2**).

58.   Within minutes of the shooting, Deputy Leonhardt arrived at the scene, and his dashboard camera captures the location of Robinson and Rudolph's vehicle positioned as a roadblock, and the location where the vehicle Simpson was driving came to rest after he attempted to avoid hitting the officers.  Leonhardt Video, 16:42:05 – 16:42:20.  (See Certificate of Service of Leonhardt Video and Leonhardt Video submitted as **Exhibit 4**).

59.   Deputy Leohhardt's dashboard video also demonstrates that there were multiple plowed driveways that Robinson and Rudolph could have used to

turn their vehicle around, park off the roadway, wait for the suspected stolen vehicle to drive by, and then initiate an investigatory stop using their lights and sirens to notify the driver to stop and pull over.  Leonhardt Video, 16:41:40 – 16:42:15.  (See **Exhibit 4**).

60.  Immediately following the shooting, Robinson and Rudolph began to fabricate the cover-up for the shooting death of Loren Simpson.  Rudolph repeatedly states that Simpson "gave it the goose" (which he explained to Detectives Fritz and Bancroft meant that Simpson spun his tires while accelerating towards the officers).  Simpson Video, Pt. 3 16:42:40; 16:56:10; 17:08:52.

61.  Robinson repeatedly states that Simpson "hit the gas and came right at us" (Simpson Video, Pt. 3 16:42:48), "came at me" (Simpson Video, Pt. 3 16:55:07), "the fucker came at me" (Simpson Video, Pt. 3 16:56:01), "the car came at me" (Simpson Video, Pt. 3 16:56:14), "he steps on the gas and his car comes straight…comes from here and starts coming my way." (Simpson Video, Pt. 3 17:00:05 – 17:00:35).

62.  Robinson goes so far as to say "I don't know how he didn't hit our car." Simpson Video, Pt. 3 17:00:41 – 17:00:43.

63.  Robinson and Rudolph—apparently unaware that the dash camera is still recording--then rehearse their story with Robinson saying "at the range we

were at, with him coming at us with the car, he probably would have smashed right into us if we wouldn't have taken him when we did." Simpson Video, Pt. 3 17:06:19 – 17:06:27.

64.   Rudolph responds "Yeah, we'd have been lucky if (unintelligible) he wouldn't have killed anyone." Simpson Video, Pt. 3 17:06:26 – 17:06:31.

65.   Robinson and Rudolph persisted with these claims during the initial round of the interviews with Detectives Fritz and Bancroft, before Robinson and Rudolph were forced to watch the video. Robinson states that he "saw those wheels spin and the front end of the car start to swerve towards me." Yellowstone County Doc. 148. (See **Exhibit 2**).

66.   Robinson also falsely claimed "once the car came to a stop there were no more rounds fired." Yellowstone County Doc. 150. (See **Exhibit 2**).

67.   Robinson continued to make false statements regarding the events that preceded the shooting, stating "I saw the wheels spin and I saw the front end of the car come for me and I knew that if I didn't stop him he was gonna kill me." Yellowstone County Doc. 151. (See **Exhibit 2**).

68.   Rudolph also repeated his false claim that he "saw the tires kick up dirt and gravel and snow. He kind of fishtailed a little bit and started coming right to us." Yellowstone County Doc. 222. (See **Exhibit 2**).

69.   Rudolph even claimed that the vehicle was "floored" as it was coming towards them.  Yellowstone County Doc. 224.  (See **Exhibit 2**).

70.   After reviewing the video with Detectives Bancroft and Fritz, both Robinson and Rudolph were forced to acknowledge that their initial statements about the circumstances of the shooting were false.  Robinson admitted "when I first saw the video it shocked me because I didn't—when I'm watching the video it looks like he's trying to drive past me."   Yellowstone County Doc. 195.  (See **Exhibit 2**).

71.   Robinson further admitted "when I saw that video that didn't match my memory."  Yellowstone County Doc. 195.  (See **Exhibit 2**).

72.   Robinson was likewise forced to acknowledge that the video does not show the vehicles tires spinning out, and that the vehicle is going away from him rather than towards him.  Yellowstone County Doc. 204-206.  (See **Exhibit 2**).

73.   When Detectives Bancroft and Fritz showed the video of the shooting to Rudolph, he could not identify anywhere on the video where the vehicle "gave it the goose", or where the tires kicked up mud and gravel. Yellowstone County Doc. 270-274.  (See **Exhibit 2**).

74.    Rudolph also acknowledges that the video depicts the vehicle attempting to avoid hitting Robinson rather than attempting to hit Robinson.  Yellowstone County Doc. 274.  (See **Exhibit 2**).

75.    Detective Fritz's viewed the video numerous times and questioned Robinson and Rudolph regarding all aspects of the shooting, and he was "unable to find any evidence of the suspect's, Simpson, vehicle had spun his tires and accelerated at the deputies."  Yellowstone County Doc. 55.  (See **Exhibit 2**).

76.    Detective Fritz further stated "[i]t should be noted over the course of several days of viewing the video it did not appear to Detective Fritz that the suspect's vehicle increased its speed as it approach (sic) the deputies." Yellowstone County Doc. 69.  (See **Exhibit 2**).

77.    Robinson and Rudolph's conduct violated six distinct sections of the Yellowstone County Sheriff's Office Policy Manual.  First, YCSO Policy 3-2(I)(C) governs the use of AR-15 Patrol Rifles, and in subpart (7) the Policy provides examples of when an AR-15 Patrol Rifle should be used, such as:

   a.  Felony stops

   b.  Armed  barricaded suspect(s), inner perimeter use

   c.  Area searches for armed suspect(s),

   d.  Patrol rifles should not be deployed for routine circumstances not involving weapons.

   e.  Dispatching injured wildlife

Yellowstone County Doc. 1069.  (See **Exhibit 2**).  Because this incident was a routine investigatory stop of a suspected misdemeanor theft, the AR-15 Patrol Rifle should never have been deployed.

78.    Second, YCSO Policy 3-1(VI)(E)(1) provides that "deputies shall not draw or exhibit their firearm unless circumstances create reasonable cause to believe that it may be necessary to use the weapon in conformance with this policy."  Yellowstone County Doc. 1064.  (See **Exhibit 2**).  There was no reason for Robinson and Rudolph to deploy their weapons before the suspect vehicle had even come back into view.

79.    Third, YCSO Policy 3-3(VII) governs the use of Roadblocks.  Roadblocks are characterized as "a force likely to cause death" and should not be used until "after other reasonable alternatives have been exhausted."  They are only to be used in life and death situations or situations where deadly force would be authorized, unless the Sheriff or Undersheriff gives specific authorization.  YCSO Policy 3-3(III)(F) also prohibits officers from "boxing in" or "heading off" a suspect's vehicle.  Yellowstone County Doc. 1077-1079.  (See **Exhibit 2**).  Robinson and Rudolph positioned their vehicle as a roadblock in the middle of White Buffalo Road in violation of YCSO Policy 3-3(III)(F) and 3-3(VII).

80.    Fourth, YCSO Policy 3-3 governs Vehicular Pursuit and apprehension of fleeing violators.    Section 3-3(III)(D) of the Policy provides that "upon initiating a pursuit, deputies will immediately activate emergency lights, headlights and sirens."  Yellowstone County Doc. 1077.  (See **Exhibit 2**). Robinson and Rudolph never activated the lights or siren of their patrol vehicle while they were following the suspect vehicle, or when the suspect vehicle was driving back down the road towards them, in violation of Section 3-3(III)(D).

81.    Fifth, YCSO Policy 3-1(VI) governs the use of Deadly Force.  Deadly Force is authorized only when the officer <u>reasonably</u> believes that such force is necessary to prevent imminent death or serious bodily harm to the deputy or another, or to prevent the commission of a forcible felony.  Yellowstone County Doc. 1064.  (See **Exhibit 2**).  Robinson and Rudolph's use of deadly force was done in violation of YCSO Policy 3-1(VI) because no reasonable officer in their position could have believed Simpson was attempting to strike them with his vehicle.

82.    Sixth, YCSO Policy 3-1(I) governing the use of force provides that "[a]s the situation that necessitated the use of force diminishes, so too shall the use of force."   Yellowstone County Doc. 1059.  (See **Exhibit 2**).  Robinson and Rudolph violated this Policy by continuing to fire into the back of the

vehicle after it had come to rest in the ditch and could no longer pose any threat to them.

83.    Following Detective Fritz and Bancroft's investigation of Robinson and Rudolph's conduct on January 8, 2015, the Yellowstone County Sheriff's Office informed Robinson and Rudolph that the County "would be initiating disciplinary proceedings, up to and including termination of employment." Defendants' Response to Request for Admission No. 1, November 25, 2015. (See **Exhibit 3**).

84.    The grounds for informing Robinson and Rudolph that they would be disciplined up to and including termination of employment were the "lack of meaningful discussion in the patrol vehicle between the officers concerning options available and tactics employed." Defendants' Supplemental Response to Interrogatory No. 5, March 23, 2016 submitted as **Exhibit 5**.

85.    Rather than being disciplined up to and including termination of their employment, both Robinson and Rudolph resigned from the Yellowstone County Sheriff's Office. Defendants' Response to Request for Admission No. 1, November 25, 2015. (See **Exhibit 3**).

86.    Expert Witness Ernie Burwell has submitted a report outlining his conclusions regarding Robinson's and Rudolph's violations of YCSO

Policies and whether their use of deadly force was reasonable and justified.

His opinions are found in the Expert Report submitted as **Exhibit 1**.

DATED October 3, 2016.

DATSOPOULOS, MacDONALD & LIND, P.C.

By: /s/ Nathan G. Wagner
Nathan G. Wagner
*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

I certify under Local Rule 7.1(d)(2)(E) that this brief is double-spaced, has a proportionally-spaced typeface of 14 points, and contains 5,739 words of text.

DATSOPOULOS, MacDONALD & LIND, P.C.

By: /s/ Nathan G. Wagner
Nathan G. Wagner
*Attorney for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Nathan G. Wagner, one of the attorneys for the law firm of Datsopoulos, MacDonald & Lind, P.C., hereby certify that on October 3, 2016, I served a true and correct copy of the foregoing document, postage prepaid, to the following by the following means:

| | |
|---|---|
| [ ] U.S. Mail | Mark A. English |
| [ ] FedEx | Kevin Gillen |
| [ ] Hand-Delivery | Deputy Yellowstone County Attorneys |
| [ ] Facsimile | Yellowstone County Courthouse, |
| [ ] Certified Mail, Return Receipt | Room 701 |
| Requested | P.O. Box 35025 |
| [ ] Email | Billings, MT  59107 |
| [x] ECF Electronic Filing | menglish@co.yellowstone.mt.gov |
| | kgillen@co.yellowstone.mt.gov |

By:    /s/ Nathan G. Wagner
          Nathan G. Wagner
          *Attorneys for Plaintiff*