

Detective Shane X. Bancroft
C&O: 15-700313
Incident: OIS- Vehicle Search/Inspection
Date: 1-15-15

On 1-15-15 at approx. 0930 hrs I traveled to the Yellowstone County Evidence Building to complete the search of the 1995 Ford Explorer.

As I completed the search I wanted to start the vehicle to make some observations.

I noted that the car was still in "Drive" (D) and that the vehicles transmission was in 4-LOW.

I put the car in park and started it up. I put my foot on the brakes and confirmed that the brake lights were operational. I also put the vehicle in reverse and confirmed that the reverse lights were operational.

Det. Fritz took photos of the vehicle and memorialized my observations.

Det. SX Bancroft

48



Detective Fritz began taking overall photographs of the scene. Once the overall photographs had been completed, Investigators began searching for evidence, in particular the expended .223 caliber casings and expended .12 gauge shotgun casings. While searching for the casings, Investigators discovered in front of Deputy Robinson's patrol car several .223 caliber shell casings as well as several red and blue .12 gauge shotgun shell casings. The casings appeared to go in somewhat of a straight line away from the patrol car.

Detective Fritz began photographing the suspect's vehicle which was marked with evidence marker number 1. The suspect's body was photographed in place in the front driver's seat and had been marked with evidence marker number 2. Deputy Robinson's patrol car, car number 9, was marked with evidence marker number 3. Deputy Robinson's Patrol Rifle was laying on the hood his patrol car and was marked with evidence marker number 4. Deputy Rudolph's .12 gauge shotgun had been placed on the front driver's side in between the door and driver's seat. The shotgun was marked with evidence marker number 5. It was determined that Deputy Leonhardt arrived on scene after the shooting had taken place. Deputy Leonhardt had arrived as a cover officer after the incident. Therefore Deputy Leonhardt's vehicle was not marked with an evidence marker.

After the vehicles had been photographed, Detective Fritz photographed the area where the shotgun shells and .223 caliber casing had been laying. Once the shells and casing had been photographed, Yellowstone County Sheriff's Office Detective Jim Kamminga began taking measurements. While Detective Kamminga was taking measurements, Detective Fritz walked South on White Buffalo Road looking for the area where the suspect had possibly spun his tire and accelerated as reported by Deputies Robinson and Rudolph. Detective Fritz walked South on White Buffalo Road for approximately a quarter (1/4) of a mile. Detective Fritz walked up to the crest of the hill and was unable to find any evidence the suspect's, Simpson, vehicle had spun his tires and accelerated at the deputies. Detective Fritz photographed the road up to the crest of the hill.



Investigators then removed the suspect's body from the vehicle. Prior to the suspect being removed Detective Fritz took several photographs of the suspect's body in the driver's seat. Detective Fritz noted the suspect had a pair of sun glasses laying in his lap as well as both hands being his lap. The suspect's head was slumped forward. Just before Investigators opened the driver's door, Investigators observed what was believed to be the orange colored plastic wad from a shotgun round. The wad was stuck in the outside driver's side door frame. Detective Fritz photographed the wading, which was left in place to be recovered at a later time. Once the driver's door had been opened, Detective Fritz continued to photograph the suspect's body. Investigators performed a quick external examination on the suspect's body and discovered what appeared to be a bullet wound to the back of the suspect's neck. The wound appeared to be slightly to the left of the mid-line on the suspect's neck. Investigators also observed what was believed to be a bullet defect to the driver's seat head rest. The defect appeared to go straight through the head rest.

At approximately 8:20 pm the suspect's body was removed from the vehicle and placed in a new white plastic shroud. Investigators preformed a quick search of the suspect's pockets in an attempt to locate anything that might identify the suspect. Investigators were unable to locate any identification on the suspect's body. Detective Fritz photographed the suspect's head and noted blood around the suspect's nose and mouth area. The suspect was then placed in a new blue body bag which was zipped up and secured with a red zip tie (#0822338) by Yellowstone County Deputy Coroner Cliff Mahoney. The suspect's body was later transported to the Morgue located at St. Vincent's Healthcare, 1210 North 30th Street.



Once the measurements had been completed Investigators began collecting the shells and



vehicle was coming back toward them, at which time he and Deputy Rudolph get out of their patrol car. At 4:38:10 pm Deputies Robinson and Rudolph can be seen approaching the vehicle while the vehicle is still moving toward them. Deputy Rudolph had his shotgun up into his shoulder pointing toward the vehicle. Deputy Robinson had his AR-15 patrol rifle slung over his shoulder with the mussel of the rifle pointing toward the ground. At 4:38:12 pm both deputies are continuing to approach the vehicle as the vehicle is in motion. Both deputies are heard telling the suspect to stop. Deputy Robinson brings his rifle up to shoulder and points the mussel at the vehicle.

At approximately 4:38:14 pm the suspect begins to turn the wheels to the vehicle to left. Both deputies continued to tell the suspect to stop, however the vehicle continued to the left. It appeared that Deputy Robinson continued to advance on the vehicle in the vehicle's line of travel. At approximately 4:38:16 pm the first shot is fired at the vehicle. It appeared Deputy Robinson fired his patrol rifle first and was off set at an approximate thirty to forty degree angle to the vehicle. It should be noted this was a visual approximation only. Without any point of reference from Deputy Robinson to the vehicle Detective Fritz was unable to give an exact angle. Deputy Rudolph then fired his shotgun with Deputy Robinson continuing to fire his patrol rifle. At approximately 4:38:17 pm the vehicle begins to slid sideways and Deputy Robinson is observed backing up to get out of the way. Both Deputies Robinson and Rudolph continue to fire their weapons into the back of the vehicle.

It appeared Deputy Robinson emptied the magazine from his patrol rifle and is observed transitioning to his side arm. Deputy Rudolph continued to fire into the back of the vehicle. Smoke can be observed coming from the vehicle's tires spinning. Small particles of what was believed to be rubber could also be observed hitting the windshield of the patrol car. The spinning tires could also be heard in the video. At approximately 4:38:22 pm both deputies stop firing at the vehicle. Deputy Robinson is heard giving the driver commands to shut down the vehicle.

At approximately 4:38:51 pm Deputy Rudolph advised dispatch of shots fired and requested medical be dispatch to their location. At approximately 4:39:11 Deputy Robinson approaches the driver's side of the vehicle. At approximately 4:40:02 pm Deputy Rudolph activated the overhead emergency lights on the patrol car. Deputy Rudolph advised dispatch to continue medical however, it was believed the suspect was deceased. Dispatch was also advised of a dog in the vehicle.

At approximately 4:41:04 pm both deputies are standing behind the suspect's vehicle. Deputy Robinson tells Deputy Rudolph "good call on the rifle". At approximately 4:42:23 pm Deputy Leonhardt arrives on scene as cover. Deputy Rudolph tells Deputy Leonhardt "pretty sure this our guy from the B and E from down the street though. And that's our stolen car". Deputy Rudolph went on to tell Deputy Leonhardt "he was down there. He saw us we're outside challenging him, he gave it the goose, spun into here". Deputy Robinson tells Deputy Leonhardt "he's coming down the trail, we tell him to stop, he hits the gas and came right at us. There was nothing we could do".

It should be noted over the course of several days of viewing the video it did not appear to Detective Fritz that the suspect's vehicle increased its speed as it approach the deputies. It should be further noted at the time the scene was processed, Detective Fritz walked up the hill and did not find any



C&O #

# YELLOWSTONE COUNTY SHERIFF'S OFFICE
### CASE REPORT

**CASE NO.**
2015-00700302

| SUPPLEMENT |
|---|

On January 8, 2015, at 1352 hrs, I Deputy Rudolph was dispatched to Berry's Cherry's car dealership at 849 1st Ave N. for a report of a vehicle theft. Dispatch gave out the vehicle information as a 1995 purple Ford Explorer without any plates. I advised dispatch that vehicle matched the description of a Suspicious vehicle that Deputy Robinson and I checked on Rykken Circle bearing the VIN 1FMDU24XXSUA74994, earlier today. Report #2015-00700269. I advised dispatch that I would respond to the area of Rykken Circle, in an attempt to locate the vehicle first. The vehicle was not located, so I responded to Berry's Cherry's.

I spoke with the complainant, Jerry Ray SCHUSTER (DOB 08-03-1963 PX 672-5437), he said that he took the 1995 purple 2 door Ford Explorer as a trade-in about Tuesday (01-06-2015). The Explorer was parked in the NE area of the lot on the Detail Row, and he still had the only key that was given to him. When the previous owner Megan Marie PRICE (DOB 07-09-1985 PX696-7889), came to gather the items that she left in the Explorer around lunchtime, she said that the vehicle was gone. This was when Schuster reported it stolen. Schuster said that he could sell the Explorer for about $1000.00. I asked Schuster about security camera footage from that area. He said that he didn't think there was cameras for that area, but would check the footage. I had Schuster take and show me the area where the vehicle was last seen. The area was covered with fresh snow, but it appeared that the vehicle backed out and headed towards 3rd Ave N.

As we walked back to the office of Berry's Cherry's, the previous owner Price showed up and said that she thought she just saw the Explorer driving in the Heights near the Country Inn and Suites motel, she said that it was driven by a male with a scruffy brown beard. I asked Price if the Explorer had any identifiable characteristics, she said that she thought it had a broken drivers side headlight. Deputy Robinson and I responded to that location in an attempt to locate the vehicle and advised Dispatch to have City Police sweep the area. We drove through the motel parking lot, through the parking lot of Bottles and Shots. We then drove through Two Moon Park and the parking lot of Target. The vehicle was not located, so we went to the Holiday gas station on Main/Josephine for fuel, I had Dispatch enter the VIN 1FMDU24XXSUA74994 as stolen. Rudolph 332

| REPORTING OFFICER NAME AND ID# | DATE | REVIEWING SUPERVISOR | DATE |
|---|---|---|---|
| RUDOLPH # 3-32 | 01/10/2015 | KETCH, JOEL | 01/10/2015 |

## YELLOWSTONE COUNTY SHERIFF'S OFFICE
### CASE REPORT

CASE NO.
2015-00700303

---

### SUPPLEMENT

On January 8, 2015 at 1620 hours I was dispatched to 3695 Justice Trail for a report of burglary. The complainant, Katelyn A. ANTON (DOB: 09/09/1986, add: same, PX: 545-4688) told dispatch when she arrived home her front door (which was locked when she left) was open and from what she could see in the house that items were missing.

While en route I responded to the shooting (15-7000313) on Shooters Bluff Trl. After I cleared the Shooters Bluff scene at approximately 1915 hours Captain Michaelis and I traveled to 3695 Justice Trail to investigate the burglary.

Katelyn told me she left the house around 0945 hours this morning for a doctors appointment. When she returned around 1500 hours the front door to her house (facing east) was wide open. She walked in to the living room and her shelves which used to be full of DVD movies were empty. Katelyn said she then went back outside, called dispatch and waited for a Deputy.

Katelyn told me after waiting outside for quite a while she decided to have her husband (whom she is separated from) Christopher A. ANTON (DOB: 12/01/1982, add: 3570 White Buffalo, PX: 672-0275) come and check the house for suspects. Katelyn first called Christopher accusing him of taking the property from the house. The couple separated on December 3, 2014 and had recently been fighting over who would take the substantial movie collection. Katelyn said Christopher accused her of being responsible for the break-in and denied taking property from the house. Christopher checked it for occupants, told her it was clear and returned to his mothers house down the street. Katelyn waited in the living room until Captain Michaelis and I arrived.

While Katelyn was waiting she also discovered three hat boxes containing her home made jewelry (assorted headbands, earrings and necklaces) were missing. Katelyn makes and sells jewelry for income (etsy.com/shop/FaeriesForNature) and provided me copies of her complete inventory lists; I highlighted items that were stolen and attached them to the report. Katelyn stated the jewelry inventory was worth approximately $5,000. Also missing were two bags containing 40 assorted Skylander action figures (worth approximately $13 each) which are used with the Nintendo Wii game system. While I was in the house
Katelyn also discovered a bottle of Hydrocodone and Amoxicillin prescribed to her were missing. Katelyn stated the missing DVD collection was worth approximately $4500 and comprised of approximately 800 movies of which approximately 150 were Blue-Ray Dvds. She provided a partial list of the DVD collection which she said was outdated; I attached it to the report.

Captain Michaelis dusted for latent finger prints and was unable to recover any. There were no signs of forced entry and it appears the front door was used for entry and exit. A window in the kids bedroom at the end of the hall was disturbed and items were knocked off of the entertainment center next to it; however there were no tracks in the snow outside and it doesn't appear that was an entry or exit point.

⬤ e were many light-truck type tire tracks in the driveway leading to the house along with shoe prints which I photographed. The tracks utside edge to outside edge measured 72 and to the inside of the pair of tracks measured 54. Katelyn stated that to her knowledge no one has driven up the driveway past the mailbox since the last snow and she did not recognize the tire tracks in the driveway.

On January 10, 2015 I spoke to Katelyn again at her home. When asked why she thought her husband would be responsible for the missing property she said he has taken things in the past out of spite. She went on to say that they were fighting over whom would get the movie collection. She believes Christopher might have taken the jewelry to hurt her, as that is her source of income. Katelyn stated that Christopher has a key to the house but refuses to return it.

Katelyn's theories seem plausible, as many commonly stolen items like the large flat screen TV, Xbox and Wii consoles were left behind. Only the movies and items belonging to Katelyn were taken.

I went to Christopher's parents house to interview him. He is away for the weekend for Army Reserve duty, but I did notice his fathers truck in the driveway; a 1993 Dodge Ram MT plate 3-32445B wearing Uniroyal Liberator tires, size 235/75R16 which appear to match the tire tracks I photographed at the scene. Searching online it looks like the track width listed for that vehicle is approximately 64. Katelyn said that when Christopher came over to check the house for her he did not drive all the way up to the house; he parked by the mailbox.

J. Leonhardt 3-59

| OFFICER NAME AND ID# | DATE | REVIEWING SUPERVISOR | DATE |
|---|---|---|---|
| EONHARDT # 3-59 | 01/09/2015 | KETCH, JOEL | 01/10/2015 |

# YELLOWSTONE COUNTY SHERIFF'S OFFICE
### CASE REPORT

CASE NO.

2015-00700303

## SUPPLEMENT

On Thursday January 8, 2015 at approximately 1647 hours I received a phone call from Lt. ODonnell asking me if I was aware of the call on White Buffalo. He advised him briefly that deputies had fired gunshots at this location. I advised him that I would respond. I then received a call from Sheriff Linder when I was en-route.

At approximately 1725 hours I arrived on scene. I was advised that Deputies Rudolph and Robinson had shot at an oncoming vehicle and they had fired as it was pointed at Deputy Robinson. I checked on their welfare and they said they were alright.

Barrier tape was across the road and they were in a patrol on the non secure side of the barrier tape.

I was advised that they were responding to a burglary on Justice Trail when they came across this vehicle that was leaving the area and was the possible suspect. I later found that they had also recognized this vehicle as a stolen vehicle that they had taken the report on earlier in the day. After Captain Wallis arrived on scene and he took over the scene. I asked if anyone had been to the burglary that had been reported on Justice Trail to see if this suspect was possibly involved in that scene. I was advised that no one had been there.

At this time 1900 hours Deputy Leonhardt and I went to 3695 Justice Trail. When we arrived we noticed tire tracks entering the driveway. We parked on the roadway as not to disturb these. We then walked to the side of the driveway so we would not disturb any tire or shoe prints that were left in the snow. Deputy Leonhardt took photographs as we approached the residence. When we got to the front stoop of residence you could see shoe pints in the ice but nothing really distinguishable. He did photograph one on the steps using a kubaton as a reference for size. We looked at the front door on the easterly side of trailer and could not see any sign of forced entry. We walked to the northerly side of the trailer and did not see any shoe prints as we went around the trailer to the west side we could see tracks in the snow but they did not appear to be fresh and were later followed and appeared to have been left earlier in the day or day before. We heard the occupant call out to us and we identified ourselves. We went back to the front door and spoke with the victim KATELYN ANTON dob/090986 px. 406-545-4688. We asked if she had reported a burglary and she said that she had. I asked her if she had been through her residence and she advised that her ex-husband had come out to the house and secured it. We asked if she was missing anything and she said that she was.

She advised that she had received a ride home from the doctor from CHRIS KNAPP 406-248-8349, address unknown. She said that walked up her driveway and found the front door was open. She said she went into the residence and saw that the DVDs/ BLU RAY approximately 800 had been taken from the shelves that were located in the living room area. She then called her ex-husband asked him if he had been in the residence and he had not. She said that she also discovered two sets of Queen size bed sheets were missing from the dryer area a green set and a purple set (600 count). Also missing were three hat boxes containing jewelry that she makes and about 185 glitter necklaces. The hat boxes are described as White with black letter, Pink with chrysanthemums, and Blue with three words on it D-unk ,Believe, & Achieve also with chrysanthemums. The victim was on crutches with a broken foot or leg and couldnt get around the house very well so Deputy Leonhardt checked the main bathroom for some of her medications and she was missing hydro-condone and amoxicillin.

I went back to my car to get a fingerprint kit and tape measure. While there a subject approached me and asked me if I was stuck on the road. I asked him if he had seen anyone around the residence earlier and he said that he had seen a Black Suburban at the residence about 1430 hours. He said that he doesnt know the neighbors and really didnt know if the vehicle belonged or not.  He identified himself as DUSTY HILLAR  355-1367 of 3632 Justice Trail. I went back into the residence and asked the victim is she knew anyone with a black suburban and she did not. I asked her if she has had any suspicious phone calls or visitors and she said that a subject in black pickup unknown name shows up every couple of months wanting to buy vehicles. I checked the book shelves for latent prints and was unable to locate any. I also dusted a medicine cabinet and was unable to locate any prints. Deputy Leonhardt received a taped statement from the victim. Deputy Leonhardt had also talked with the victims ex-husband and he advised that he had come to the house but was not able to drive up the entire drive way so tire tracks further into the drive are assumed to be that of the suspects vehicle, which also left anti freeze drip marks and antifreeze at the house end of the driveway.

We then went back to the patrol and took pictures of tire tracks and shoe prints as we walked back towards the house. A standard tire track measuring approximately 10 inches wide.  We also measured the tire width from side to side and came up with 54 inches inside to inside and 72inches  outside tread to outside tread. We also located three styles of shoe prints one a vibram sole, one smoother sole with two circles in the arch area and a smaller one with waves on the heel.

We left this residence at approximately 2039 hours and went back to White Buffalo drive to see if any of the stolen items were in the suspect vehicle. We approached the vehicle with Detective Fritz and Wallis and did not see of the described stolen items inside the suspect vehicle.

Michaelis

| REPORTING OFFICER NAME AND ID# | DATE | REVIEWING SUPERVISOR | DATE |
|---|---|---|---|
| MICHAELIS, 3-03 | 01/08/2015 | | |

# YELLOWSTONE COUNTY SHERIFF'S OFFICE
### CASE REPORT

| | CASE NO. |
|---|---|
| | 2015-00700313 |

## SUPPLEMENT

On 1-8-14 at approximately 1352 hours, Deputy Rudolph and I were dispatched to Berry's Cherries at 849 1st Ave N for an auto theft call. The vehicle described in the dispatch narrative, a 1995 purple Ford Explorer (VIN 1FMDU24XXSUA74994), matched the description of a suspicious vehicle call we had responded to earlier in the day at Rykken Circle (see 15-700269). Deputy Rudolph called dispatch and asked them to check with the complainant to see if the VIN from the earlier vehicle matched the one being reported stolen. Dispatch confirmed the match, so I advised them we would be going to Rykken Circle first to see if we could locate the vehicle before we responded to the complainant's location. We proceeded to Rykken Circle, but did not find the vehicle there. We searched the area for the stolen Explorer, but were unable to locate it. I then sent the Sheriff's secretary the vehicle information and asked her to enter it into CJIN as stolen. I also requested that dispatch broadcast an attempt to locate on the vehicle.

We then responded to Berry's Cherries and spoke to the manager there, Jerry Schuster (dob: 8-3-63). Schuster told us he had taken the Explorer in as trade on Monday or Tuesday, and the previous owner, Megan Price (dob: 7-9-85), had left some of her belongings in the vehicle. When she returned today to retrieve the belongings, the car was no longer on the lot. Deputy Rudolph spoke with Schuster as I observed, and Deputy Rudolph had Schuster show us where the Explorer had been parked. Schuster showed us a spot on the east side of the lot, where he said there would be no camera coverage. I asked Schuster to review his video to see if the suspect had possibly driven through an area where the cameras did cover, and he said he would do that. As we were speaking to Schuster, Price arrived on the lot and told us she had just seen the Explorer driving in the area of the Country Inn and Suites on Main St. Deputy Rudolph and I went back to our car and went to the area of the Country Inn and Suites. We were unable to locate the Explorer, so we searched the area, checking the top lot of the Metra, the Target parking lot, and Two Moon Park, but still did not find the vehicle. I told Rudolph that since we had originally found the vehicle on Rykken Circle, it was possible that Loren Simpson (dob: 2-7-86) was involved. Simpson is often in this area, as he associates with Daniel Farley (dob: 9-25-85), who lives in trailer #2, which is two trailers down from where the Explorer had been parked. Simpson is also known to live at 704 Key City Dr, so we checked that address and the Wal-Mart parking lot, but did not find the vehicle at either location. I called Schuster and advised him that we were not able to locate the Explorer. We then advised dispatch that we were clear.

We were then dispatched to 3695 Justice Trail for a burglary call. Deputy Rudolph drove to the area, and as we turned onto White Buffalo Road he had to stop for a group of children who were being picked up by their parents. Once the vehicles in front of us began to move, we continued toward Justice Trail. As we approached the intersection of White Buffalo and Justice Trail, we observed a purple SUV pull out of Justice Trail and proceed northbound on White Buffalo Rd. Deputy Rudolph and I both agreed that it looked like the stolen Ford Explorer. Deputy Rudolph advised dispatch that we had observed a vehicle that matched the description of the stolen Explorer and that we would be following it before we responded to the burglary. It seemed likely that whoever was driving the vehicle was somehow involved in the burglary, so we followed at a distance, with two cars between us, in order to observe the driver's behavior. As the cars between our patrol car and the suspect vehicle turned off, Deputy Rudolph attempted to close the distance between us to confirm that it was the stolen Explorer. Though the road conditions did not permit us to get close enough to see the driver, we were able to see that it was a purple two-door Explorer, and was likely the stolen vehicle.

As we approached the crest of the hill on White Buffalo, the Explorer accelerated away from us. We were unable to follow, as the road was steep and snow-covered, and we were driving a two-wheel drive vehicle. My patrol car became bogged down on the road, so Deputy Rudolph began to reverse back down the hill, looking for a place to turn around. I advised dispatch that we were no longer able to follow the vehicle. As Deputy Rudolph was backing up, he accidentally drove into a snow drift, getting the patrol car stuck. As I attempted to push the car out, a white Jeep Cherokee pulled up. The driver exited and asked us if we needed any help. I said I would appreciate it, and they helped push the car out of the snow. Deputy Rudolph then parked the car in the center of the road where it was unlikely to get stuck again.

I then spoke to the driver of the Jeep, Brian Tucker (dob: 6-23-98) and asked him if he lived over the hill, and he said yes, he lived on Shooter's Bluff. I asked Tucker if White Buffalo came out anywhere else or if it was a dead end. He said it was a dead end and the only way out was to come back this way. I asked Tucker for his phone number and asked if he would be willing to tell me if he saw the purple Explorer. He said he would, so I advised him not to approach the vehicle, just drive into the area, and when I called, let me know if he saw it. Tucker agreed and got back into his car and drove over the hill.

Deputy Rudolph and I decided that since the suspect was in a stolen vehicle and possibly involved with the recent burglary, we should have rifles at the ready, just in case he decided to do anything drastic. I went to the trunk and retrieved my patrol rifle and Deputy Rudolph got my shotgun out of the rack. I keep a 20 round capacity short magazine loaded in my rifle with 18 rounds in the magazine. I brought the rifle to the passenger seat of the car while I gave Tucker time to get to his house. Approximately five minutes later, I called Tucker, and he confirmed that the Explorer had been driving around in the area and was now headed back up White Buffalo toward our direction. I confirmed that Tucker had said the Explorer was heading in our direction, and he said it was. I thanked him and hung up. I advised Rudolph to be ready, because the Explorer was returning, so he loaded three rounds of slugs into the shotgun. I also loaded a round into the chamber of my rifle. I advised dispatch of the situation and asked that if Deputy Leonhardt was close to our location to have him start heading to our location.

At this point I observed the Explorer crest the hill, so I advised dispatch of this, and then I exited the passenger side of my patrol car. Deputy Rudolph exited the driver's side. I walked away from my car toward the side of the road as the Explorer came down the hill in approximately the center of the road toward us. There was a snow bank in front of a panel fence on my right side, and my patrol car behind me to my left. I looked at the driver of the vehicle, who appeared to be a male wearing sunglasses, and loudly ordered him to stop the car. The Explorer continued moving down the hill, so I raised my rifle and again ordered the driver to stop. I then saw the rear wheels spin and kick up snow, and the front end of the Explorer swing toward me. I realized at this point that the driver intended to run me over in order to get past my patrol car, so I began to fire my rifle at him in an attempt to stop him from hitting me with the vehicle. I fired all 18 rounds from my rifle into the vehicle, causing the Explorer to turn off the road and collide with a snow bank in front of the panel fence to my right. I stepped toward the center of the road to avoid the Explorer as it spun off the road. The rear wheels of the Explorer were still spinning at a high rate of speed, so I wasn't sure if the

| REPORTING OFFICER NAME AND ID# | DATE | REVIEWING SUPERVISOR | DATE |
|---|---|---|---|
| ROBINSON, 3-67 | 1/8/2015 | CUNNINGHAM, KEVIN | 01/12/2015 |

142

shotgun out of the rack before that and had loaded ah I believe he loaded three slugs into the into the magazine 'cause it was loaded it you know it was loaded with buckshot to start with. So he cleared three rounds of buck and loaded in three rounds of slugs. I exited the vehicle, he exited the vehicle I uhm the ah the car was parked... Go ahead?

TC.    Where were you in the vehicle?

JR.    I was in the passenger side I'm sorry ah Deputy ah Deputy Rudolph was driving today he's training so uhm I was in the passenger side of the vehicle and I exited ah Deputy Rudolph got out. I the way I remember it now I, I believe I stepped out to the side of the road but was visible to him but I wasn't standing in between my car and him. I was off to the side.

DP.    And it's daylight and there's plenty...

JR.    Daylight. Yeah they can see that it's a patrol car and see I'm in uniform so ah I. I don't doubt that he knew who who we were because we were following him and he knew we were following and when he was coming back he knew that was a cop car sitting in the middle of the road and that we were both uniformed officers.

DP.    Ok.

JR.    Uhm I had my rifle and I don't believe I had it pointed at him to begin with. I yelled stop. He continued down the road and I believe I raised my rifle and said stop I might have said stop right now or something like that and that's when I saw the wheels spin his rear wheels spin.

DP.    Did you have eye contact with the driver?

JR.    Yeah I, I looked at him and I'm pretty sure he looked right at me. He was wearing sunglasses so it's hard to tell exactly but he was looking he was looking at me.

DP.    Mm hm (affirmative).

JR.    He was looking directly in my direction. So the I, I see the wheels spin and and I, I just can't remember at this point without seeing a video or something which way I stepped but I see those wheels spin and the front end of the car start to swerve towards me. And at that point I opened fire on the vehicle. I was aiming at the the driver. I had a 20 round magazine in my in my rifle and ah I emptied the rifle. At some point the car ah spun off the road uhm in front of me and hit the hit the a

DP.    Ok. Uhm when the car was had spun and was in the snow bank and still spinning rubber and ah snow and mud and whatever else was being thrown up from the back tires ah could you tell were you still giving commands at the time to the person as you were approaching the car?

JR.    Yeah I was I, I don't I can't remember right now what what exactly I said but I was I was telling him to show me his hands show me your hands he, his, he was his head was flung forward, I could see blood ah ah at least on his shirt here. He I didn't see any, any breath ah coming from him so he was nonresponsive to to all my commands.

DP.    And did you as you approached the car to cover it while you sent Deputy Rudolph back to the uhm to your patrol car to make the radio call did you remember firing any rounds into the car while it was in that position?

JR.    No once, once the car came to ah a stop there were no more rounds fired.

DP.    Ok.

TC.    And from the position you'd taken up to the side of the patrol car ah do you remember where you did you step forward were you moving when you were firing?

JR.    Ah I (exhales) my recall is ah a little fragmented right now. I, I believe I was stepping ah after I fired my initial rounds into the into the windshield the car turned this way and I think it was ah it turned like off the side of the road like toward my passenger of my vehicle. I can't tell you what direction that is right now uhm but as it did I, I believe I tracked it and continued to fire until my weapon was dry.

DP.    Uhm when you initially saw that purple car on White Buffalo coming off of Justice you were going to Justice Trail to take a burglary report?

JR.    Right.

DP.    Based on your interactions revolving around that car all day did you think at any point that maybe that car was involved in this other burglary?

JR.    That was that was the very first thought you had. We're going to we've been following this stolen car most of the day and uhm I don't know who that was in the car uhm but a lot of times we have we have interactions with ah Loren

C&O#15-700313 Jason Robinson        KLR                        Page 7

**150**



Simpson who will steal a car and then go and commit burglaries in a stolen car so he can if he needs to bail out we can't tie him to that car. And so I assumed that that was the same kind of thing that was going on here, somebody had stolen a car and it was in an area where we see Lawrence in it quite a bit. I said that's probably one of our prime suspects here you know. And so I assumed that that car was likely involved in the burglary that had just taken place out there. I mean it just seemed like way to much of a coincidence. Do you want me to continue...

DP.    Sure.

JR.    ...from where I was at? Ok. So uhm I guess that was that ah that was pretty much it after ah ah Deputy Rudolph called in ah shots fired from the car and made sure medical was rolling. I retreat I retreated to my car ah once I was sure that ah he wasn't gonna be exiting the car ah be any more of a threat to us. I retrieved a pair of gloves ah went back to check see if there was a pulse or anything and but if there was any sort of aid I could render. (Exhales.) (Pause.)

DP.    Sorry I just ok you did what you had to do in the situation that you were in ok?

JR.    Yeah. Anyway it was clear that he was ah deceased and ah had Deputy Rudolph or Deputy Rudolph had the presence of mind to let other ah units know that we were 10-38 and that the subject was 10-7 so they could slow down their response so that no one else was put in danger. And then we waited for ah respond units to arrive.

DP.    Ok. When you saw when you were standing on the side of the roadway and you were telling the guy to stop the car?

JR.    Yeah.

DP.    And he clearly trained on you and then you saw the nose of the car swing towards you did you believe he was gonna try and run you over?

JR.    Yes I did. I was...

DP.    And you sensed the acceleration in the vehicle you *unintelligible*?

JR.    I, I saw the wheels spin and I saw the front end of the car come for me and I knew that if I didn't stop him he was gonna kill me.

TC.    And your patrol car was in the middle of the road, you're off to the side.



JR.    Yeah.

FF.    Ok. Uhm so in the were those the only two calls that you got on the the purple SUV?

JR.    Uhm yeah they're the only two calls and then we had Megan Price telling us that she saw it.

FF.    Megan Price mm hm (affirmative).

JR.    Up at Bottles N Shots too.

FF.    Ok. Ok. Ok I'm sorry go go ahead so you get the call for the burglary call?

JR.    So we get the burglary call on on ah Justice Trail. Ah so ah Rudolph jumps on the interstate and we get off at the Huntley exit and go around Pryor Road around the golf course. Uhm we're getting down to White Buffalo ah which is you know around the other side. And as we're coming up to White Buffalo we see there's a bunch of kids in the road. Ah it looks like the school bus had just dropped 'em off and there were parents sitting there waiting to pick up kids and so we kind of pulled up and stopped and waited for kids to get in cars and and ah Rudolph was talking to a couple of little girls down there. So we go there ah you know kids down here and so we sat there and waited and just a little while later ah there was like two cars ahead of us. They took off up White Buffalo and we were kind of behind 'em and as we're heading up White Buffalo getting toward Justice Trail uhm from our left I'm I'm not sure of the directions like I said earlier.

SB.    Sure that's fine.

JR.    (Laughs.) From our left at Justice Trail here comes a purple Ford Explorer. Now this is this Ford Explorer is a lavender purple. It's not like uhm a deep ah plum or maroon or something like that.

FF.    Mm hm (affirmative).

JR.    It is a light lavender. I've never ah it's not like we see these these color Explorers all over the place ok so it was like we both looked at it and went what? And Rudolph says is that our car? I said it sure looks like it. I think that's our car. And he says ok I said well go ahead and follow it 'cause it came out of Justice Trail and then it turned left and went the same direction we were heading which I thought (someone coughs) because I was north bound. I'm not sure but...

FF.    I think its south bound.

JR.    Yeah well.

SB.    Either way.

JR.    Whichever direction it is.

SB.    Sure.

JR.    We were headed that way (exhales).

FF.    Ok.

JR.    And there are two cars in between us and so we're kind of watching it from a distance. We didn't turn on lights or anything like that we just wanted to see what was going on with this car.

FF.    Ok.

JR.    And if it was that car we wanted to make contact with it. And so we head up White Buffalo and it's the it starts to get steeper as you go up and ah these cars between us peel off ah as we're going and ah and pretty soon it's just us and this other car.

FF.    Ok.

JR.    Well I ah tell I think I told Rudolph let's try to get closer to it make sure and as we do it starts pulling away. And we were pretty sure at that time he knew we were behind him.

SB.    Is there a reason why you didn't try to shut it down then?

JR.    Ah well it was too far away and it was running.

FF.    Ok.

JR.    So to to me there was no point in turning on the lights he was gonna keep going anyway. And, and so you know it wasn't at that point ah a question of doing a traffic stop. He was too far away.

FF.    Mm hm (affirmative).

JR.    And he looked like he was taking off.

SB.    Was he was he pulling further away or were you guys slowing down because of it?

JR.    No well he was…

SB.    Ok.

JR.    Uhm I would think the last time that I, I loaded it was after we ah did shot gun quals and ah…

SB.    Even if I had to put down a deer or something if I fired one year of buck shot from it to put down a deer I load another round of buck shot in it.

JR.    Exactly.

SB.    I never emptied it to figure it out.

JR.    Right.

SB.    I mean I wouldn't have I wouldn't know unless I emptied my gun.

JR.    Yeah that last round was…

SB.    What if it wasn't _unintelligible_?

JR.    Slug it would yeah it wasn't it wasn't intention that it was there.

SB.    Ok. Right. Just trying to figure a question out.

JR.    Yeah yeah it surprised me because I had ah I thought all round all those rounds would have been buck.

SB.    Ok.

JR.    Yeah.

FF.    (Video is resumed.) Ok so now the vehicle's gonna come down the roadway here in just a minute ok?

JR.    Yeah.

FF.    There's approximately a three minute lag time between the time that you call and the time the vehicle is seen coming around the hill.

JR.    Ok.

FF.    Ok. At any time did you think about getting your spike strip out?

JR.    You know (exhales) we deal with so many of these calls Fritz ah I didn't think that this was gonna be a deadly encounter. Ah you know you don't you there's always that possibility. Ok but I have done so many stops with so many people and it it has never it's always ended peacefully people normally comply. (Exhales.) This was kind of ah tense situation it was kind of a waiting game we were just waiting to see if this car was stolen. We've been chasing it all day and ah I became a cop for one reason and that's to catch bad guys. This is somebody in a stolen car. That's, that's a bad guy ok and I wanted to catch him. I was

excited to catch him. That's what I wanted to do. And so we were kind of nervous waiting to see what was gonna happen and thought oh cool we're gonna we're gonna take down a car thief today.

FF.  Mm hm (affirmative).

JR.  And so ah I wasn't I wasn't thinking I was gonna have to spike this car I wasn't thinking I was gonna have to shoot this car. I was thinking I was gonna present I'm with the sheriff's office do what's what you're supposed to do and I was gonna arrest whoever this was and take 'em to jail because I just caught 'em driving a stolen car. That's what I thought and so at at this time was I was I preparing for other circumstances? No. Was ah was I trying to figure out what I could do other than unload 18 rounds of .223 into this car no because I didn't expect it to come to that.

FF.  Ok. (Video is resumed.)

JR.  If you want to pause that for a second I just want to explain ah a couple things first of all. You'll hear me using 332 that's Rudolph's number.

FF.  That's Rudolph's number.

JR.  Uhm dispatch when when you're riding with somebody when you're 10-12 with somebody and you're training and you're going by their number they want you to use their number because they're the ones that that they have on the screen so that's why I'm using (someone coughs) his number when I get on the radio and call.

FF.  Mm hm (affirmative).

JR.  I'm not using mine I'm not using my own number.

SB.  Sure.

JR.  And at this point I realize ok well you know we have ah a poss likely stolen car. Uhm I know Leonhardt's pointed this this way. Now we know now we know he can't get out. He's and now we know he's likely coming back our way. So I tell dispatch send him up here for cover because the more the better.

FF.  Mm hm (affirmative).

JR.  The more the better in these kind of situations.

JR.     I don't know what I was exactly what I was saying. I, I think I said don't move twice and at some point I think I said don't ah show me your hands because I didn't know. I didn't know at that time.

SB.     Sure.

JR.     If he was…

FF.     Mm hm (affirmative).

JR.     …incapacitated or not. The the amount of time that it took for him to turn toward me for me to fire 18 rounds and come around was what how, how long was that three seconds.

SB.     It wasn't very long.

FF.     It wasn't very long *unintelligible* seconds.

SB.     Wasn't very long at all.

FF.     *Unintelligible.* So.

JR.     Can we back it up and see exactly how many seconds that was?

SB.     Sure.

JR.     'Cause I'd like to know.

FF.     (Video is resumed.) Four seconds.

JR.     (Exhales.) Now if I could say something ah (someone coughs). The angle of this video this car is sitting in the center of the road. I'm not exactly sure how far off to the left it is. I'm standing over here on the left so the video the camera's looking straight down the road.

SB.     Right.

JR.     Ok. And when I when I first saw the video it shocked me because I didn't when I'm watching the video it looks like he's trying to drive past me.

FF.     Mm hm (affirmative).

SB.     And that's, and that's my next phrase out of my mouth is you need to understand as we go through this we're gonna go this in slow motion as well. All I can see a two dimensional video of what I see on the screen so as we go through I need to know what you're seeing and what you're feeling.

JR.     That's exactly what I wanted this. Tell me right now is that when I saw that video that didn't match my memory.

C&O#15-700313 Jason Robinson (2)     KLR                                         Page 41

**195**

FF.    Ok.

JR.    And ah I already did I'm firing here and as the car is now sliding into this ditch thank you Deputy Rudolph for not shooting me in the back.

FF.    (Exhales.)

JR.    Uhm I continue to fire at the car because the threat hasn't stopped.

FF.    Mm hm (affirmative).

JR.    It's continuing and I'm locked into the target.

FF.    Mm hm (affirmative).

JR.    And again that was four second time frame. I dropped my mag and I reached for another one and I realize I don't have one so I sling my my rifle and draw my pistol and approach and begin to yell commands. And Deputy Rudolph was covering from behind. At this point again the the car is the wheels are spinning and speeding up and slowing down. We don't know if he's incapa capacitated or not. He's not moving inside the car and I, I tell him not to I told him not to move so.

FF.    Mm hm (affirmative).

JR.    Uhm ah I don't know if he's just obeying commands or, or what's going on we're at this point you're just so shocked at what just happened that you're just trying to get your head going again.

FF.    Did you ever see did you ever see the reverse lights come on?

JR.    No.

FF.    So the, the wheels were spinning forward?

JR.    Yeah.

FF.    Is what you're seeing?

JR.    Yeah.

FF.    Ok.

JR.    They're kicking snow and stuff out from behind the Explorer toward us here in this direction.

FF.    Ok. Tell me when to stop or reverse or?

SB.    No uhm ok I just want some quick clarification. You fire at the vehicle 'cause he was coming right at you.

JR.    Mm hm (affirmative).

SB.    Ok. I realize this happens very very quickly and we're talking about a matter of four seconds and all the stuff going on etc. etc. but you say the the threat hasn't stopped. The threat was the vehicle coming towards you correct?

JR.    Yes.

SB.    But then once the vehicle is past you why do you keep firing?

JR.    Because I'm just....

SB.    I realize it happens very quickly.

JR.    Yeah it is exactly it as I'm locked in I'm locked into the threat the vehicle's still moving.

SB.    Ok.

JR.    Ah (someone coughs) just hadn't occurred to me to stop yet.

SB.    And I understand that these things happen very very quickly under high stress so don't I'm not I'm not judging I'm just trying to clarification.

JR.    I ask myself the same question a hundred times while I'm watching this video.

SB.    Ok.

JR.    And the answer is that he was coming at me and I'm pulling the trigger and it's still coming at me and so I'm just following the target that I am already aiming at.

SB.    I understand. Ok. I'm good. Alright Fritz get to me to the top of the hill and come back down. In your report you indicate you see the wheels spin and start to come towards you. At quarter speed can you show me about where that where that you see that and that triggers your well no pun intended triggers your reaction.

JR.    Yeah. Uhm if you can show just run it at full speed real quick.

FF.    (Exhales.)

JR.    And then we can back it up ah because it's it...

SB.    I understand.

JR.    Can you pause it for a second?

FF.    Sure.

JR.    When, when I was standing out here on the road and I'm yelling at him and I'm watching him and I see those tires turn ah I know it I saw it there's no it's not I know I saw it it's not ah in my head I saw it. I saw those wheels spin I saw the

snow kick up. I watched this video probably 10, 15 times and you can't can't see it.

SB.   Ok.

JR.   You can't see it but he, he comes down and right right as he starts to turn toward me (someone coughs) that's when the wheels kick up they kick and then he turns toward me. And I can I can show it to you.

SB.   Sure.

JR.   Ah…

FF.   You tell me what speed you want me to go full, half, quarter?

JR.   Ok just go ahead and go half speed.

FF.   Ok. Ah tell me when to stop or whatever.

JR.   Ok. We *unintelligible* right there. I say stop again right there and now the yeah it must be about right there that kick ah right there where he turns.

FF.   Mm hm (affirmative).

JR.   Those wheels spin and those wheels turn toward me that's what I see.

FF.   Ok. Now ok let me ask you this do you know roughly what the distance is from the car to you at this point?

JR.   Again I, I have a real hard time with this.

FF.   Ok.

JR.   I'm just trying to guess that's 30, 40 feet.

FF.   Ok.

JR.   And so he plows into that that snow bank there.

FF.   Mm hm (affirmative).

JR.   His wheels spin and he turns toward me. I start shooting and he plows into that snow bank. Ah I don't have a whole lot of memory.

FF.   Mm hm (affirmative).

JR.   On a lot of this.

SB.   Sure. I understand.

FF.   Yeah.

JR.   Uhm I just I remember staying on on that target and pulling a trigger until he actually collided with the with the snow bank and came to a stop.

**205**

FF.     Mm hm (affirmative).

JR.     That's, that's pretty much all I remember.

SB.     Ok. Hang on Fritzy before you forward it. So we're clear would you agree when we look at the video from this two dimensional angle it looks like it's going away from you instead of in front of you?

JR.     At this point yeah it does.

SB.     Ok. But when you make the decision to fire in your eyes that's coming right at you?

JR.     It's coming right at me.

SB.     Ok.

JR.     If you back it up for just a second Fritz?

FF.     Tell me when to stop or?

JR.     Stop right there. Ok he's kind of angling over this way you can see.

SB.     Ok.

JR.     You can go quarter speed. Watch those wheels turn that's coming at me right there.

SB.     Gotcha ok.

JR.     You can watch me kind of take a half step.

FF.     Mm hm (affirmative).

JR.     And that's when I started firing because that's where I'm standing he turns from the middle of the road.

FF.     Mm hm (affirmative).

JR.     And turns at me.

FF.     Mm hm (affirmative).

JR.     Not this way not out this way but at me. Now this distance at 30 or 40 feet I don't have time. I don't have time to dive in over here or dive out there (someone coughs).

FF.     Mm hm (affirmative).

JR.     He's coming at me.

FF.     Mm hm (affirmative).

rounds on target where they're not gonna hurt anybody else. Were they gonna hurt the person that we need to to deal with and that's it because the pistol's not even accurate at distance someone's in a car and things happen faster in a car.

SB.    Ok.

JR.    So that's that was that was what my line of thinking at that time. I wasn't thinking hey I'm gonna have to disable this vehicle with you know and maybe we should throw down spike strips I didn't even that wasn't even…

FF.    Did did you guys ever consider going all the way back down to uhm Pryor Creek Road and waiting once you once you ascertained that there was only one way in and one way out going all the way back down to Pryor Creek Road and waiting for him to come out down there?

JR.    No uhm ah I would say that the reason that we my thinking at the time was well there's only one way out there and there's no other way out here.

FF.    Mm hm (affirmative).

JR.    We've got him bottled up.

FF.    Mm hm (affirmative).

JR.    Now ah we want to catch this guy we got him caught. Well you know there were other places he could take the vehicle and you know maybe there are other roads he could go off and ditch it and hide somewhere and take off running we don't know.

FF.    Mm hm (affirmative).

JR.    But I know darn well that between here and Shooter's Bluff on the other side now I know there's nowhere else to go. He's gonna have to come to us.

FF.    Mm hm (affirmative).

JR.    So we can stop him and take him into custody. And that's what I was thinking I wanted to catch him.

FF.    Ok. Uhm I know we've asked this question before ok you're you're are you aware of the sheriff's office policies on road blocks?

JR.    Ah I, I don't I'm not a hundred percent sure on that. I don't think they're allowed.

FF.    Ok.

JR.    Uhm on the road block people.

**216**

Kept going on uhm White Buffalo I think it's White Buffalo, kept going up that so we just kind of stayed behind it watching it. One vehicle pulled off and as we got we were behind it we didn't activate any emergency lights or equipment. Just kept following it and then it kind of sped off and as we started going we kind of got stuck. Ah there was a white vehicle that came up behind us it was like two teenagers asked if they could help and I said yeah and we so they kind of helped us push it out 'cause we were kind of stuck so we backed out kind of got back in the tracks of kind of the roadway. We looked at the map book came to the conclusion that it was a dead end. There was two roads that go up and there's no way out so we're like he's got to come back. Uhm we radioed asked that there was ah a four wheel drive that was still out. Pretty much everybody today was busy so it was just a bunch of Crown Vic's so we just kind of sat and waited. Uhm Robinson got his AR out of the trunk. I detached the the shotgun out of the rack and we just kind of got ready just in case something happened 'cause ah well if he comes down he's gonna come right to us. So and then I kicked out two of the shotgun shells and put slugs three slugs so there's three slugs in the shotgun. Uhm and we just had it ready and then we saw the vehicle oh uhm Deputy Robinson made contact with the kid that was driving the white vehicle behind us. He asked him where he lived and he said I live further up the road. So Deputy Robinson asked him well if you're going up there and you go up there if you see this vehicle don't do anything call me. So after a while Deputy Robinson I think Deputy Robinson called him and then the kid said yeah that sat there is coming down to you guys. So we got out of the vehicle and about the time we saw it kind of come down the road and we kind of went to the front of the vehicle and started kind of waving him. He got I would say 50 to 75 yards in front of us and we're hollering at him to shut it down, turn off the vehicle, turn off the vehicle. And then we just saw I saw tires kick up dirt and gravel and snow. He kind of fishtailed a little bit and started coming right to us and that's when I shot and I think Deputy Robinson shot. I don't know how many times I shot. Uhm the vehicle kind of fishtailed and kind of turned in front of our vehicle into the snow bank and when it was in the snow bank the tires it was like it was four 'cause the tires were just smoking and

C&O#15-700313 Christopher Rudolph  KLR                              Page 3

**222**

DP.    Ok. And as it came over the hill and started coming towards you could you tell how many people were in the *unintelligible*?

CR.    I could just tell one person.

DP.    Ok. Uhm and then you said you know you observed the tires started spinning and gravel and it kind of pick up speed. Did you see it change course or try and?

CR.    I well it came, came back over over the top of the hill kind of and it saw us and we're out there. Nobody had weapons pointed at him at this time. We were just hollering shut it down shut it down and I was like there was kind of it seemed like he was kind of creeping forward still but then it just seemed like the tires kicked in and it kind of fish tailed. Deputy Robinson was on the passenger side, kind of front corner panel. I was on the driver's side front corner panel and when the vehicle started coming towards us I believe Deputy Robinson kind of moved in front of my vehicle and I was kind of kind of in front of him further and then as the vehicle came towards us we started shooting and then it kind of veered off like almost at a 90 and went into the snow bank.

DP.    Did you notice the driver of that vehicle do anything while you were giving commands?

CR.    He just had his hands on the steering wheel that's just it seemed like the vehicle was floored.

DP.    So you think he was intentionally trying to run *unintelligible*?

CR.    Yes I think he was intentionally trying to run us over.

DP.    Ok. Uhm and both of you were telling the guy to stop?

CR.    Yeah.

DP.    And neither of you initially had your weapons pointed at *unintelligible*?

CR.    Right.

DP.    What made you think to you know say to Deputy Robinson and for you to get the shotguns out and the long gun out?

CR.    Well I (exhales) I didn't think ah a pistol would do anything if we did get involved and *unintelligible* the long gun would have been a better choice that's why I swapped out the buck shot and then went to the slug. Uhm and he had his AR so I just being a cop you know in Virginia and the little bit I was in Colstrip I



CR.    And then we drove down an address or down Key's I think it was Key City Street behind Walmart. Uhm…

SB.    Any reason why you went down Key City?

CR.    Deputy Robinson said that he thought it might have been someone that was associated with somebody that lived on Rykken Circle. Uhm but we didn't see anybody or any vehicles down there so.

FF.    Did he tell you the name of the person that he thought?

CR.    I think he did but I don't remember.

FF.    Ok.

CR.    Uhm 'cause the where that vehicle was parked on Rykken Circle was right next to a trailer that we'd been trying to serve warrants (somebody coughs) on trying to locate somebody. Uhm…

SB.    And did he give you any more description of why he thought that that person might be involved in this.

CR.    He prob I can't remember if he did or didn't.

SB.    *Unintelligible.*

CR.    Uhm so after we had cleared ah that that ah Key City Street ah we went and got some fuel and told dispatch that we were gonna be clear of the vehicle theft. Uhm and then we got dispatched to a burglary on Justice Circle. So we went down the interstate and I think I can't remember if we I think I said well let's swing by ah Rykken Circle see if it's there again just 'cause it was on the way. So we jumped off and went down Rykken Circle, it still wasn't there. Got on Johnson Lane, got on the interstate and went to Justice Circle. Uhm as we were going down Pryor Creek Road just before Justice Circle.

SB.    Let me just slow you up for one second.

CR.    Ok.

SB.    So after you're dispatched to to the burglary you still go through Lockwood to see if that vehicle's there?

CR.    Yeah.

SB.    So was the was the burglary dispatched as a cold burglary, in progress burglary what information do you have on that?



CR.   Ah I can't remember I think it was a cold burglary at that time. The, the complainant said that the front door was open and she'd been there a while I think. So that's...

SB.   You didn't feel any urgency to get there like there was someone in the house?

CR.   No, no, no, no. Yeah.

SB.   Ok. Alright.

CR.   So that's that's why we just kind of jumped off instead of taking the interstate we just took the Frontage Road and as we passed Rykken Circle on the Frontage Road no not there. Jumped on Johnson Lane and kept going.

SB.   Sure.

CR.   Uhm once we turned on ah Pryor Creek Road at the I think its White Buffalo Road there was a school bus that had just dropped off kids. There's some kids milling around, looked like some parents were picking 'em up. There was a white colored SUV that was parked facing ah towards Pryor Creek Road and there was a teenager scraping snow off of it. The kids kind of got in their vehicles. There was a vehicle in front of us and a vehicle, two vehicles in front of us. Uhm when I watched the video I noticed that it was a flat bed pickup and like a Honda Ridgeline type pickup. Uhm they were in front of us and as we were sitting there when they were picking up kids I see coming down Justice Circle a purple SUV. Uhm it kind of I couldn't tell if it was a two door but ah it was one that I haven't seen before.

SB.   I'm gonna step you back just one second.

CR.   Ok.

SB.   So between Lockwood and ah the parking exit and going to this ah this burglary ah did you were you going code, no code what was?

CR.   No no code. No, no, no code no lights or sirens.

SB.   It's a cold burglary?

CR.   Cold burglary we were just doing the speed limit.

SB.   Yeah that'd be the appropriate response?

CR.   Yeah.

SB.   Ok.

SB.    Ok. Chris when you when you look at a video like this despite the fact it's a high quality video of a high quality piece of equipment.

Video playing. _Unintelligible_.

SB.    Can we pause for a second.

FF.    Ok.

SB.    Despite all that it doesn't get all the detail and things like that. In your statement and you report you say that you describe creeping, acceleration and mud and snow being kicked up. As we go through this I want you to show me where you see this happening 'cause as I'm looking through it or you or better yet…

CR.    Ok.

SB.    …when you remember it happening more than what you see happening 'cause when I look through I can't see any specific moment.

CR.    Right.

SB.    When it looks like he creeps or accelerates and then the only thing I want I want you to look at is again it's a video it's a two dimensional video and you were there what you're seeing might be the exact angle that I see in the camera's eye but it appears that the vehicle tried to get go away from Deputy Robinson not at him.

CR.    Ok.

SB.    Ah I think if you can see what I'm saying I'm also looking for that fish tail.

CR.    Ok.

SB.    That you're describing I'm just not seeing again I mean he certainly loses control and goes in the ditch eventually.

CR.    I think that the fish tailing that I'm thinking of is when the vehicle gets to like this point and the back end comes around almost to where he's like turns into the snow bank.

SB.    Right.

CR.    That's what I'm thinking…

SB.    Ok. Ah from the viewer's point of view it appears that he's like trying to go around you.

CR.    Ok.

SB.    Not necessarily losing control at that stage but I'm not saying that's the case I'm saying it's what my view ah my mind's eye sees.

CR.    Ok.

SB.    That's why I kind of want you to walk me through it.

CR.    Ok.

SB.    So let's walk through it one more time at full speed and then we'll go half speed or quarter speed whatever you want.

CR.    Ok.

SB.    And you kind of show me these points.

FF.    And if you need me to you can tell me stop it.

SB.    Stop, pause it we'll go back.

FF.    Or whatever ok.

CR.    Ok. (Video is activated.) (Radio talk.) Stop, stop, stop. Shut it down. Right now Shots fired. Right there that's before we started shooting uhm the tires start kicking up. It's not so much uhm like uhm mud.

SB.    Right.

CR.    But it's the back tires kicking up the snow.

SB.    And could that be from the change of direction or was it could you actually hear or feel an acceleration?

CR.    You could hear the engine race.

FF.    Do you think that's because he was trying to go around you, get through that snow bank ah go around you or go at Robinson?

CR.    I don't know.

FF.    Ok.

SB.    And can you go back just like ah a smidge. As the vehicle changes direction I just want to see from my my mind's eyes I'm looking at this again. (Audio played.) Now. Shots fired. It looks like he's trying to go around Deputy Robinson not at him.

CR.    Ok.

SB.    Is your vision *unintelligible* at that time?

CR.    Ah I didn't know exactly where Deputy Robinson was so I...

SB.  Sure.

CR.  ...I would say in my my my perph in my perph vision I he just seemed where he was kind of standing...

SB.  Ok.

CR.  ...and I didn't uhm right now I could see we're in front of where our vehicle is I thought he was further over.

SB.  Right.

CR.  Same thing when we was you know started challenging him as we were walking forward.

SB.  Right.

CR.  I didn't know exactly where he was.

SB.  Ok.

FF.  Play it?

SB.  I think so.

Video playing. (Shots fired.) *Unintelligible* shut it down. (Shots fired, shots fired, shots fired.) Shut it down, shut it down.

FF.  Do you remember as you're as you're firing into the back of the vehicle were you standing directly behind the vehicle or were you off set?

CR.  Uhm off set?

FF.  Ok. (Video playing.) *Unintelligible* dispatch 3-32 shots fired. If he would have backed up would he have hit you or not?

CR.  I think the (someone coughs) his back bumper was kind of kind of in line with me like I wasn't directly behind it but I was kind of...

FF.  Ok.

CR.  ...near it.

SB.  Do you estimate the angle you were at to the that vehicle if you're and we'll do this *unintelligible* best part of it if that's the front of the vehicle and that's the back of the vehicle...

CR.  I would say it was like right about here ah the front of my patrol I think was like here.

SB.  Ok.

CR.    So…

SB.    When the vehicle comes to rest in the ditch where are you?

CR.    Ah I think well kind of more in line with it.

SB.    Not a 45 degree?

CR.    Not yeah I was still angled I wasn't directly behind it but I wasn't like a 45.

SB.    Not at a 45 off to the side that way?

CR.    Yeah so what is is that like a 25 or is *unintelligible*.

SB.    Well I realize we're yeah we're, you're splitting hairs.

CR.    Ok. Yeah.

SB.    It's hard to judge but.

CR.    Uhm so I think I was I'd say this was a direct line behind me the vehicle I think ah was right about here.

SB.    Ok.

FF.    So we continue?

SB.    I think here we can back up to two and a half time one more time. Maybe what I'm looking for but just at half time is where do you think the vehicle accelerates.

CR.    Ok.

SB.    Where you think what do you think the the driver's intentions are at that point and I'm looking for the the fish tail or what you're seeing is fish tail.

CR.    Ok.

SB.    Uhm and as you start firing where do you think that vehicle's going and what it's ah it's up to.

CR.    Ok.

FF.    Ready?

SB.    Yeah.

FF.    And like I said tell me tell me when to stop.

CR.    'Cause see right now it looks you know where I'm standing and he's standing Deputy Robinson standing I mean it looks here you know in line with Dep where Deputy Robinson is.

SB.    I see that.

**273**

CR.    Uhm ok go ahead start again. Uhm the vehicle starts accelerating the front ah back end looks like it kind of comes around uhm with his front tire it's kind of angled forward still. Can you back up maybe a little bit.

SB.    At that point right there ok go ok.

CR.    Stop. (Audio playing.) Shut it down. *Unintelligible*...

FF.    Damn it. Sorry. Ok so tell me when to stop.

SB.    Now?

CR.    The vehicle starts accelerating uhm the front tires look like they're trying to compensate for the back, back end coming around.

SB.    At this point right now do you know where Deputy Robinson is?

CR.    No.

SB.    Specifically?

CR.    I don't know.

SB.    Ok. In your mind's eye do you think he's more right or where he is on on the video?

CR.    What do you mean more right?

SB.    More to the right?

CR.    Oh more yeah I think he is.

SB.    Ok. *Unintelligible* a little bit Fritzy and stop. Would you *unintelligible* this video the vehicle appears to be going around Deputy Robinson not at him at this point?

CR.    At this point yes uhm...

SB.    Ok. And, and you've already said that you don't know exactly where, where Deputy Robinson is correct?

CR.    Correct.

SB.    Ok but he's going ah...

CR.    The...

SB.    ...on, on the video do you see what I'm seeing?

CR.    Right. I see what you're saying you know here but there I mean...

SB.    Sure.

CR.    ...it happened so fast that...

SB.    Exactly and I understand. I'm not suggesting ah not I'm suggesting anything other than that just wanted to make sure I'm understanding...

CR.    Right.

SB.    ...ah what we're seeing versus what you were feeling and seeing.

CR.    Ok.

FF.    Continue? And this is where you see the fish tail am I correct?

CR.    Well the first this is more of ah the pronounced fish tail. When we back up just before...

SB.    When he starts when he starts to turn the vehicle is where you're speaking of?

CR.    Right. Well and the front tires start turning you know it looks like he's coming 'cause this is where he accelerated so the front tires are starting to compensate a little bit. It looks like that back ends starting to come around. Uhm here in slow motion it looks like he's just going that way. Uhm later in the video uhm when Deputy Leonhardt asked me about something we see a tractor back there and I ah tell him something about going up there and making sure that he don't cover up our tracks 'cause I was pretty sure that there was too pronounced uhm where he accelerated.

SB.    At the time you fired your weapon or fired your first rounds you believed he was in the path of Deputy Robinson?

CR.    Yes when I fired the first round I thought he was coming at Deputy Robinson.

SB.    And you're saying you weren't exactly sure at that moment where Deputy Robinson was you thought he was further right than he was?

CR.    I thought he was further right. I didn't think he was more toward the video as I don't think he was in front of the patrol car I thought he was more to the side of the patrol car.

SB.    And when he was when you see the video now it appears he was going around Deputy Robinson not at him at that time exactly?

CR.    Yeah it looks like he could have been going around us.

SB.    But you couldn't have seen that at that moment?

CR.    Right.

---

Dr. Bennett completed the examination and in the end he noted 3 remarkable injuries.

The first was a gunshot wound to the back of the neck. The bullet path began left of the mid-line and traveled from back to front, stopping under the subject's right eye. Dr. Bennett noted that the bullet traveled through the subject's brain stem. He stated that the wound would be fatal. We recovered a portion of the bullet. The wound and he recovered bullet appeared to suggest that the bullet was a .223.

The second was a gunshot wound that entered near the right shoulder and traveled right to left, stopping just under the skin by the left shoulder. Dr. Bennett suggested that the round passed under the scapula, but did not penetrate the chest wall. He indicated that the injury would cause massive internal bleeding. We were able to recover a large portion of the round. Based upon the recovered material and the wound, it was believed that the round was a shotgun slug.

354

The third injury was a gunshot wound to the right flank that entered below the 8th rib, passed through the liver and then broke apart. That round, or the pieces of the round, was not recovered.

In the end we collected the above referenced bullet fragments as well as others.

Dr. Bennett was able to use a rod to demonstrate the head wound, but could not rod the other injuries. He indicated that he would include detailed drawings with his pathology report to demonstrate the path of those wounds.

Once the procedure was completed, the decedent was transported to Smith's Funeral Home. I advised the Coroner's Office that the decedents body was not to be released to the family until I had completed more of the investigation. I told them I suspected that the body would be released within 72 hours.

We cleared the morgue and responded to the Billings Police Department where I obtained fingerprint cards in the name of Loren Simpson, 2-7-86. I was able to make a side by side comparison with the fingerprints taken from the decedent with the fingerprint cards on file. I was able to make a positive identification based upon the fingerprint comparison. The decedent was positively identified as Loren Simpson.

We then continued to the Yellowstone County Sheriff's Office – Evidence Building where the collected evidence was secured. Evidence that was wet or bloody was laid out in the drying room.

Once the evidence was secured, we cleared the scene.


Det. Shane X. Bancroft

| | | |
|---|---|---|
| **YELLOWSTONE COUNTY SHERIFF'S OFFICE**<br><br>**POLICY MANUAL** | | ***Policy Number: 3-1*** (Core Policy)<br><br>***USE OF FORCE*** |
| Effective: 07/14/14 | | Sheriff Mike Linder |

**PURPOSE:**

This policy recognizes that the use of force by law enforcement deputies requires constant evaluation. Even at its lowest level, the use of force by law enforcement is a serious responsibility. The purpose of this policy is to provide deputies of this Agency with guidelines on the reasonable use of force.

**POLICY:**

I.  Each use of force situation is unique and will be evaluated based on the circumstance faced by the deputy at the time force is applied. Deputies may use the amount of force, which is objectively reasonable to make an arrest or gain control of a situation. The application of force is not linear and may begin at or move to any level of force necessary based upon the actual or perceived threat to the deputy. As the situation that necessitated the use of force diminishes, so too shall the use of force. A deputy must be able to articulate why the level of force employed was reasonable and necessary.

II. When deploying any force, for any reason, deputies shall exercise reasonable caution in order to avoid unnecessarily endangering the lives of bystanders. When possible, deputies should give consideration to background, bystanders, and location.



1059

(d)      Off duty carry of Taser.  Carrying the Taser off duty is prohibited.

**VI.**    **Use of Force Continuum: Deadly Force**

A.    A deputy is justified in the use of force likely to cause death or serious bodily harm only if the deputy reasonably believes that such force is necessary to prevent imminent death or serious bodily harm to the deputy or another or to prevent the commission of a forcible felony.

B.    The use of deadly force against a "fleeing felon":

1.    Deputies may use deadly force to effect the capture or prevent the escape of a felony suspect whose flight is reasonably believed to represent an imminent threat of serious bodily harm or death to the deputies or other person(s).

C.    Whenever feasible, before using deadly force, deputies should identify themselves and give instructions.  For example: A deputy challenges a suspect by shouting; "Police, don't move".

D.    A deputy may also discharge a weapon under the following circumstances:

1.    During range practice or competitive sporting events.

2.    To destroy an animal that represents a threat to public safety, or as a humanitarian measure where the animal is seriously injured.

E.    Deputies shall adhere to the following restrictions when their weapon is exhibited:

1.    Except for maintenance or during training, deputies shall not draw or exhibit their firearm unless circumstances create reasonable cause to believe that it may be necessary to use the weapon in conformance with this policy.

2.    Deputies will not fire warning shots.

3.    Deputies may discharge a firearm at a moving vehicle or from a moving vehicle if it is necessary to do so to protect against an imminent threat of serious bodily harm or death to the deputies or others.

    **a.**    This provision shall not preclude tactical responses in a S.W.A.T. operation by its members.

F.    A patrol vehicle is a law enforcement tool, which is capable of inflicting serious injury or death when used as an offensive weapon.  Therefore, its use should be considered in the same light as any use of deadly force.

**VII.**    **Deputy Involved Shooting / Deadly Force Procedures:**

A.    Intentional Shooting / Use of Deadly Force:

1.    Deputy Responsibilities:

    **a.**    Deputies involved in the use of deadly physical force, on or off-duty, shall immediately notify a supervisor. If the member is off-duty and outside Yellowstone County when the use of deadly force occurred, the member shall also notify the agency with jurisdiction for investigation of the incident.

    **b.**    Ensure that the threat from the suspect has been stopped.  This includes, but is not limited to handcuffing or otherwise securing the suspect(s).

    **c.**    Determine the physical condition of any injured person, summon EMS, and render aid when appropriate and safe to do so.

    **d.**    Secure the incident scene, establish a perimeter, and act to protect all physical evidence in its original location if possible.

     b.   Six (6) rifled slug shells in the side saddle

     c.   Chamber empty, slide free (hammer down), safety off.

C.   Patrol Rifles:

1. An AR-15 rifle owned by YCSO will be issued on a voluntary basis to individual deputies in the Patrol Division.  Deputies will no longer be allowed to carry an individual purchased patrol rifle.

2. The patrol rifle make, model, serial number, caliber and deputy issued to will be recorded with the Administrative Coordinator or designee of the Sheriff.

3. Deputies will be required to maintain and qualify annually with the issued patrol rifle. Failure to properly maintain or failure to qualify with patrol rifle will result in loss of issued rifle.

     a.   Deputies will periodically test weapon mounted light for function.  Deputies will be required to maintain and replace batteries if needed.

     b.   Patrol rifles will be checked during vehicle inspections

4. The following items will be issued with each patrol rifle:

     a.   (1) 2 point sling: Blue Force Gear

     b.   (1) Weapon mounted flashlight: Streamlight HP

     c.   (2) 30 round AR-15 magazines

     d.   100 rounds duty V-Max ammunition

     e.   (1) hard side carry case

5. Deputies will keep patrol rifle secured in patrol vehicle at all times unless being deployed on a call or for training.  The rifle will be kept secured inside the dual gun mount in patrol vehicles equipped with mount or secured in hard case in trunk of patrol car not equipped with mount.

     a.   Deputies without a take home car will keep their issued rifle in their dept. assigned locker at the briefing room on scheduled days off.  The locker must be kept locked when securing the rifle.  Rifles will not be left in take home patrol vehicles for extended periods of time, (vacation, light duty, administrative leave). The rifle should be secured in briefing room locker if not on shift, exception TRT members.

6. Patrol rifles will be kept in "cruiser safe" condition.  Cruiser safe condition is defined as the following:  bolt forward on an empty chamber, hammer released, safety off and a fully loaded magazine inserted into rifle.  The rifle will be kept in cruiser safe condition until necessary to deploy on a call.

7. Deputies should utilize discretion and good judgment when deploying the patrol rifle. The rifle is a tool that allows a tactical advantage to the deputy not available with the shotgun or handgun.  Possible circumstances that may dictate deploying the patrol rifle are but not limited to:

     a.   Felony stops

     b.   Armed barricaded suspect(s), inner perimeter use

     c.   Area searches for armed suspect(s)

     d.   Patrol rifles should not be deployed for routine circumstances not involving weapons.

     e.   Dispatching injured wildlife

8. Deputies will be responsible for maintaining the issued patrol rifle.  Deputies are trained in proper maintenance in Basic Patrol Rifle class and are allowed to field strip

**1069**

| **YELLOWSTONE COUNTY SHERIFF'S OFFICE**<br><br>**POLICY MANUAL** |  | ***Policy Number:* 3-3** (Core Policy)<br><br>***EMERGENCY RESPONSE AND VEHICULAR PURSUIT*** |
|---|---|---|
| Effective: 9-13-10 | | Sheriff Mike Linder |

**PURPOSE:**

To provide guidelines for the pursuit, and apprehension of fleeing violators, and the effective operation of agency vehicles during emergency conditions.

**POLICY:**

Emergency operations of agency vehicles will be conducted in accordance with Montana Code Annotated and policy. Office members are expected to use reasonable judgment and prudent conduct with due regard for their safety and the safety of all persons and property while engaged in emergency vehicle operations.

**PROCEDURE:**

    **I.**    **Emergency Response:**

        A.    61-8-107 MCA.   Police vehicles and authorized emergency vehicles.

            1.    The driver of a patrol vehicle or authorized emergency vehicle, when responding to an emergency call or when in the pursuit of an actual or suspected violator of the law or when responding to but not upon returning from a fire alarm, may exercise the privileges set forth in this section, but subject to the conditions herein stated.

            2.    The driver of a patrol vehicle or authorized emergency vehicle may:

                a.    Park or stand, irrespective of the provisions of this chapter;

                b.    Proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;

                c.    Exceed the speed limits so long as he/she does not endanger life or property;

                d.    Disregard regulations governing direction of movement or turning in specified directions.

            3.    The exemptions granted to a police vehicle or authorized emergency vehicle apply only when the vehicle is making use of an audible or visual signal, or both, meeting the requirements of 61-9-402 MCA.

            4.    The foregoing provisions shall not relieve the driver of a patrol vehicle or authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from consequences of his/her reckless disregard for the safety of others.

            5.    The burden of responsibility rests solely with the driver of a patrol vehicle or authorized emergency vehicle to exercise good judgment and care with regard to the safety of lives and property.

        B.    Response Codes and Response:

            1.    Code 1 -- Units will respond without the use of emergency lights or siren and in compliance with all traffic regulations.

**1075**

    2. Code 2 -- Unit(s) will respond using their emergency lights and/or siren, as required by traffic conditions.

    3. Code 3 – will consist of use of lights and siren during emergency.

    4. Depending on the type of call and information available, response will be Code 1 unless at the deputy's discretion he utilizes a greater level of signaling.

  C. Significant Factors:

    1. When driving in the Code 2 or Code 3 mode, deputies must evaluate their response, keeping in mind the same considerations used in pursuit situations.  Deputies will regulate their response to any call so as not to unreasonably endanger the public safety or welfare.

## II.  Vehicular Pursuit:

  A. A vehicle pursuit is an active attempt by law enforcement officers to apprehend a suspect who refuses to voluntarily comply with the law requiring drivers to stop or yield upon the immediate approach of an emergency vehicle exhibiting emergency lights and siren.

  B. As in all police activities, concern must be exercised for the rights and safety of other persons who may be endangered by pursuit driving.  Pursuit is justified only when an officers knows or has reasonable cause to believe:

  C. The suspect presents a clear and immediate threat to the safety of other motorists;

  D. The suspect has committed or is attempting to commit a forcible felony;

  E. The necessity of immediate apprehension outweighs the level of danger created by the pursuit as in the case of a serious traffic violation such as reckless driving or driving under the influence of alcohol or drugs.

  F. All pursuit driving will be conducted within the guidelines of this statement of policy and procedure which is designed to promote good judgment and sound discretion.  All deputies have a duty to obey all relevant traffic laws, criminal statute and Office orders regarding the operation of vehicles.

## III.  Initiating Pursuit

  A. The responsibility for the decision to initiate a pursuit rests with the individual   deputy in the initial pursuing unit.

  B. Evaluating the circumstances, the pursuing deputy must constantly consider the risks created by the pursuit and should not needlessly endanger other persons.

  C. Some of the factors to be considered when determining to initiate, continue, or   terminate a pursuit are:

    1. The nature of the violation that led to the pursuit.

    2. Status of occupants of the vehicle or other involved persons.

    3. Time of Day:  Pursuits occurring during a time when there is a high level of business school or other activity are deemed as more hazardous then those occurring at other times.

    4. Volume of Traffic:  Pursuits occurring during periods of heavy traffic flow are deemed more hazardous than those occurring at other times.

    5. Location of Pursuit:  Special emphasis must be placed on the locality of the pursuit such as school areas and parks.

**1076**

      6.     Road and weather conditions.

      7.     Capabilities of pursuit vehicles and drivers.

      8.     Speeds involved.

      9.     Other law enforcement assistance.

      10.     Length of the pursuit.

D.    Upon initiating a pursuit, deputies will immediately activate emergency lights, headlights and siren.

    1.    The deputy will then notify Dispatch that he or she is in pursuit and give the following information.
        a.    Description of the suspect vehicle and license plate, if known,
        b.    Reason for the pursuit,
        c.    Number of occupants,
        d.    Location, direction of travel, and estimated speed,
        e.    Request for assistance, if needed,
        f.    Each additional change of direction and other situation changers.

E.    Dispatchers will:
    1.    Immediately clear the frequency and advise all other units of the emergency in progress.
    2.    Notify the shift supervisor of the pursuit.
    3.    Log times, locations, and other information that is broadcast by the involved officer(s).

    4.    Make the necessary notations on the complaint/dispatch form to insure easy identification and retrieval of the radio transmission tapes pertaining   to the pursuit.

F.    Pursuit Restrictions
    1.    Deputies may not pursue suspects the wrong way on divided or controlled access highways.
    2.    Deputies will not become involved in a pursuit if there are non-law enforcement personnel in his/her car.
    3.    Pursuit in an unmarked car is not authorized.

    4.    In the course of pursuit, direct contact between vehicles or forcing the pursued vehicle into parked cars, ditches, or any other obstacle, boxing in, heading off, ramming, or driving alongside the pursued vehicle while it is in motion will be Prohibited, unless such actions are specifically authorized by a commander or supervisory officer or are justified when the use of deadly force would be authorized.  Reckless or hazardous driving maneuvers will not be duplicated by pursuing officers.

IV.  **Assisting Units**
    A.    Only the unit initiating the pursuit and the assigned secondary unit will pursue   the suspect vehicle.  No more than two units will be involved in the actual pursuit unless authorized to do so by the supervisory officer on duty.
    B.    Other units close to the pursuit should attempt to position themselves at   strategic points to assist the pursuing unit in the event the suspect vehicle is stopped or if the original pursuing deputy loses contact with the suspect vehicle.  Under no

**1077**

circumstances will units other than the assigned primary and secondary units engage in high speed paralleling of the pursuit.

C.  Once involved, the assisting, or secondary unit will advise Dispatch of direction and situational changes, thus relieving the primary pursing unit of that responsibility.

D.  The secondary unit will maintain a safe distance behind the primary unit  but be close enough to provide backup assistance if, and when, required.

E.  Assisting units will, at all costs avoid intersecting the path of an oncoming  vehicle.

F.  If the primary unit becomes disabled the assisting unit will become the  primary unit. The next closest available unit will assume the responsibilities of the assisting unit.

V.  **Supervisory Responsibility**

A.  Commanding officers will insure that all deputies receive appropriate  training in the policy and procedure relating to pursuits.

B.  Shift supervisors, when notified of a pursuit by dispatch, will:

1.  Direct the pursuit and approve or order alternative tactics and  maintain control until the pursuit is terminated.  In the absence of adequate information from the primary or backup unit, the supervisor may order termination of the pursuit.  It is not necessary for the supervisor to be physically present in order to begin coordination and assert control of the pursuit.

C.  The supervisor may, at his or her discretion:

1.  Terminate the pursuit when, in his or her judgment, the   necessity of immediate apprehension or the risk of the pursuit is outweighed by the level of danger involve.

a.  Order specific units into or out of the pursuit.

b.  Authorize roadblocks as a last resort.

VI.  **Abandoning Pursuits**

A.  Pursuits will be terminated under any of the following circumstances:

1.  The suspect vehicle stops voluntarily or becomes disabled.

2.  The necessity of immediate apprehension or the risk of the pursuit is outweighed by the level of danger involved.

3.  The identity of the suspect has been established to a point that later apprehension can be accomplished and there is no longer a need for immediate apprehension.

4.  The prevailing traffic, roadway and environmental conditions indicate the futility of continued pursuit.

5.  The pursued vehicle's location is no longer known.

B.  The termination of a pursuit does not prohibit the following of a vehicle at a safe speed or remaining in an area to re-initiate pursuit if the opportunity and conditions permit.

VII.  **Emergency Roadblocks to Apprehend Suspects**

A.  All deputies must consider barricading a roadway as a force likely to cause death.  It should be used only after other reasonable alternatives have been exhausted.

B.  Roadblocks will only be used in life and death situations, unless such actions are specifically authorized by the Sheriff or Undersheriff, or are justified when the use of deadly force would be authorized.

C.  In the event the establishment of a roadblock is deemed necessary, deputies must consider the following:

1.  A location that will provide good visibility to all oncoming traffic.

**1078**

2.    Only marked patrol units will be used in the roadblock and emergency lights will be activated on these units.

3.    When the marked units are placed in position, it is preferable they will be parked at such an angle that they reveal the Sheriff's office emblem on the door to oncoming traffic.

4.    All units will be parked to avoid the line of fire from other officers.

5.    All deputies at the roadblock will remain outside their units.  A communications officer will be designated to coordinate information between the pursing deputies and deputies either at the roadblock or responding to the scene.

6.    Patrol units should allow adequate space to permit the innocent public easy access in and out of the roadblock scene.

7.    All due caution will be exercised when a vehicle matching that of the suspect vehicle either approaches or stops at the scene.  The occupants will be identified following high-risk stop procedures.

8.    Firearms safety is a critical issue and deputies will comply with all of the requirements set forth in this manual regarding use of firearms.

D.  Dispatch must notify all other local agencies of the existence of the roadblock.  At the completion of the roadblock, a second notification will be made to advise that it has been deactivated.

<u>INTER-JURISDICTIONAL PURSUITS</u>

VIII.    **PURSUITS INITIATED BY DEPUTIES**

A.    In the event that a pursuit proceeds toward another jurisdiction, units involved should switch to the State Common Mutual Aid frequency.  This frequency is known as the "Gold" channel.

B.    The Dispatch will notify the other jurisdiction that the pursuit is heading toward their jurisdiction and that our deputies are transmitting on the State Common Mutual Aid frequency and ask the location of the other jurisdiction's patrol units.  Based on the information from the primary pursuit unit, the dispatcher will specify to the other jurisdiction that:

1.    The call is a courtesy notification with no participation requested from the other jurisdiction, or

2.    The call is a request for assistance.

C.  Because of the concurrent jurisdiction of the Sheriff's Office throughout the County, pursuits initiated by them will be handled by them until the pursuit is terminated, or leaves Yellowstone County and the responsibility of the pursuit is assumed by another agency.  At that point, pursuing deputies will defer the pursuit to that jurisdiction.

IX.    **Pursuits Initiated by Another Jurisdiction**