**Nathan G. Wagner**
DATSOPOULOS, MacDONALD & LIND, P.C.
201 West Main Street, Suite 201
Missoula, Montana  59802
Telephone:  (406) 728–0810
Facsimile:  (406) 543-0134
Email:      nwagner@dmllaw.com

*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| ESTATE OF LOREN SIMPSON *et al*,<br><br>Plaintiff,<br><br>vs.<br><br>YELLOWSTONE COUNTY *et al,*<br><br>Defendants. | Cause No.: CV 15-0099-SPW<br><br>**PLAINTIFFS' STATEMENT OF DISPUTED FACTS IN RESPONSE TO YELLOWSTONE COUNTY'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiffs submit the following Statement of Disputed Facts in compliance with Local Rule 56.1(b).

**Verbatim Response to Plaintiffs' Statement of Undisputed Facts:**

1.  On January 8, 2015, at approximately 3:30 p.m., Robinson and Rudolph, both Deputy Yellowstone County Sheriffs, were on duty together with the

Sheriff's Office in the same vehicle. Deputy Rudolph Affidavit, ¶ 2; Deputy Robinson Affidavit, ¶ 2.

*Undisputed*.

2. They were both in uniform in a marked patrol vehicle. They were easily identifiable as law enforcement officers both by their uniforms and vehicle. Deputy Rudolph Affidavit, ¶ 2; Deputy Robinson Affidavit, ¶ 2.

*Disputed. The Defendants have submitted no evidence to demonstrate that Simpson was aware he was being followed by law enforcement officers. Simpson does not attempt to elude Robinson or Rudolph. At no time did the officers engage the lights or sirens on their vehicle to give Simpson notice of their intent to initiate a traffic stop until AFTER they had shot Simpson. Simpson Video, Pt. 2 16:19:42 – 16:40:03.* (**Doc. 27**)*.*

3. They saw a vehicle that matched the description of a stolen purple Ford Explorer. Simpson Video, Pt. 2 16:19:42.

*Disputed. Robinson and Rudolph were not sure the vehicle they were following was the same vehicle that had been reported stolen. While following the vehicle, Robinson tells his supervising officer Ketch, with whom he is speaking by cell phone, "No I can't see shit. I'm not even 100% sure it's the car…" Simpson Video, Pt. 2 16:23:30 – 16:23:40.* (**Doc. 27**)*.*

4. They began to follow the vehicle. Simpson Video, Pt. 2 16:19:43.  (**Doc. 27**).

*Disputed as to the implication that they were following the vehicle in an attempt to initiate a traffic stop, or that Simpson was aware he was being followed by law enforcement.  For much of the time Robinson and Rudolph were following Simpson, there were other vehicles between them and Simpson.  Even after the other vehicles turned off the road, Robinson and Rudolph did not close the distance on Simpson's vehicle, and did not turn on their lights or sirens.  Simpson Video, Pt. 2 16:19:43 – 16:24:57.  (**Doc. 27**).*

5. Before they could stop the vehicle, their vehicle became stuck in the snow on the road. They extricated their vehicle from the snow. Simpson Video, Pt. 2 16:23:20.

*Disputed as to the implication that Robinson and Rudolph were attempting to initiate a traffic stop or otherwise attempting to stop Simpson's vehicle. Robinson and Rudolph followed Simpson at a distance, without turning on their lights or sirens, and instead of initiating a traffic stop, they discussed when and how they would retrieve their AR-15 and their 12 gauge shotgun.  Simpson Video, Pt. 2 16:19:43 – 16:24:57.  (**Doc. 27**).*

6. They had been advised by a person that helped them extricate their vehicle that the road they were on was the only way to exit the area. Deputy Rudolph Affidavit, ¶ 5; Deputy Robinson Affidavit, ¶ 5.

*Undisputed*.

7.   Knowing there was only one exit from the area the vehicle had gone into and knowing they could not continue into that area without potentially getting their patrol vehicle stuck again, they parked their vehicle in the middle of the road.  Simpson Video, Pt. 3 16:33:03.

*Disputed.  Robinson and Rudolph did not "park their vehicle in the middle of the road" but rather after learning that the road was a dead end and that Simpson would have to drive back down the road towards them, Robinson and Rudolph moved their vehicle into the middle of a one-lane rural road so as to form a roadblock.  Compare Simpson Video, Pt. 2 16:22:44 with Simpson Video, Pt. 3, 16:31:39.  (**Doc. 27**).  See also Ernie Burwell Expert Report, page 3 (**Doc. 35.1**):*

*After the patrol car was pulled out of the snow bank by some teenagers, Deputy Rudolph positioned the car where no other vehicles could pass.  The patrol car was blocking the roadway where no other vehicles would be able to pass.*

*Mr. Burwell also submitted screenshots with his Expert Report showing the view from the forward-facing camera on the patrol car.  These screen shots demonstrate that the patrol car has been moved from the left side of the roadway—which would allow other vehicles to drive past—to the center of the roadway—which would not allow other vehicles to drive past.  Burwell Expert Report, page 4. (**Doc. 35.1**).*

>   When Robinson was questioned by Detective Fritz as to why they didn't just drive back down to Pryor Creek Road and wait for the vehicle to come down the road so they could initiate a traffic stop, Robinson admitted the reason was "[w]e've got him bottled up…there's nowhere else to go.  He's gonna have to come to us." Yellowstone County Doc. 216 (**Doc. 33.2** p. 20).

8. To prepare for the vehicle's return, they armed themselves with their long guns, a shotgun and a military style semi-automatic rifle. Simpson Video, Pt. 3 16:35:54.

>   Disputed as to the implication that there was any need for Robinson and Rudolph to "prepare for the vehicle's return" by retrieving the AR-15 and the 12 gauge shotgun.  Robinson and Rudolph had no contact with Simpson prior to the time they shot him, and thus they had no reason to believe he was armed, that he posed any danger to them, or that he posed any risk of flight.  Simpson Video, Pt. 2 entire video (**Doc. 27**); Simpson Video Pt. 3, 16:31:39 – 16:38:15 (**Doc. 27**).  The Defendants have admitted in discovery that "prior to the shooting of Loren Simpson, neither Deputy Robinson nor Deputy Rudolph had any knowledge that Loren Simpson was carrying or armed with a weapon." (See **Doc. 33.3**, Request for Admission No. 3).

9. Deputy Robinson phoned one of the people who helped the deputies extricate their vehicle and was told the suspect vehicle was returning down the road towards them.  Simpson Video, Pt. 3 16:34:58.

   *Undisputed.*

10. They saw the vehicle approach them. Simpson Video, Pt. 16:37:59.

    *Undisputed.*

11. They exited their vehicle with their weapons drawn.  Simpson Video, Pt. 3 16:38:12.

    *Undisputed.*

12. When the vehicle neared their position without stopping or slowing, they repeatedly ordered the vehicle to stop with their weapons pointed in the direction of the vehicle.  Simpson Video, Pt. 3 16:38:15.

    *Disputed.  The video of the shooting clearly demonstrates that the vehicle was slowing down as it approached the roadblock.  Simpson Video, Pt. 3 16:38:14 – 16:38:18 (**Doc. 27**).  Disputed as to the implication that Simpson could hear the orders being made by Robinson and Rudolph.  The windows on the vehicle were rolled up because of the cold and snowy conditions, and there is no evidence that Simpson could hear Robinson or Rudolph's instructions.  Simpson Video, Pt. 3 16:38:14 – 16:38:18 (**Doc. 27**).*

13.  The vehicle did not immediately attempt to stop.  Simpson Video, Pt. 3 16:38:15.

*Undisputed*.

14.  The vehicle appeared to apply its brakes and begin to veer in the direction of Robinson.  Simpson Video, Pt. 3 16:38:19.

*Undisputed that the vehicle applied its brakes, but disputed that the vehicle veered in the direction of Robinson. Simpson Video, Pt. 3 16:38:14 -16:38:18 (**Doc. 27**).  Former Deputy Robinson, former Deputy Rudolph, Detective Bancroft and Detective Fritz all agree that the video shows Simpson attempting to avoid hitting Robinson and Rudolph.*

*When Robinson was interviewed by Detectives Bancroft and Fritz and he shown the video of the shooting, Robinson stated during his interview as follows:*

> *And when I first saw the video it shocked me because I didn't—when I'm watching the video it looks like he's trying to drive past me.*

*Yellowstone County Doc. 195.  (See **Doc. 33.2** p. 15).*

*Later during this same interview, Detective Bancroft and Robinson had the following exchange:*

> *Bancroft: Ok.  Hang on Fritzy before you forward it.  So we're clear would you agree when we look at the video from this two dimensional angle it looks like it's going away from you instead of in front of you?*
>
> *Robinson: At this point yeah it does.*

*Yellowstone County Doc. 206.  (See **Doc. 33.2** p. 19).*

*Likewise, when Detectives Fritz and Bancroft interviewed Rudolph and showed him the video, Detective Bancroft and Rudolph had the following exchange:*

> *Bancroft: Would you <u>unintelligible</u> (probably "agree that in") this video the vehicle appears to be going around Deputy Robinson not at him at this point?*
>
> *Rudolph: At this point yes, uhm ...*
>
> *\*\*\**
>
> *Bancroft: And when he was—when you see the video now it appears he was going around Deputy Robinson not at him at that time exactly?*
>
> *Rudolph: Yeah it looks like he could have been going around us.*

*Yellowstone County Doc. 274-275. (See **Doc. 33.2** p. 29-30).*

*Detective Fritz's report of his investigation contains the following findings with regard to the video of the shooting:*

> *It appeared Deputy Robinson fired his patrol rifle first and was off set at an approximate thirty to forty degree angle to the vehicle. It should be noted this was a visual approximation only. Without any point of reference from Deputy Robinson to the vehicle Detective Fritz was unable to give an exact angle.*

*Yellowstone County Doc. 69. (See **Doc. 33.2** p. 3).*

*Expert Witness Ernie Burwell has also reviewed the video and has submitted the following statement in his Expert Report:*

> *Deputy Robinson and Deputy Rudolph used excessive, unreasonable and unnecessary force when they shot and killed Loren Simpson. Simpson was not a threat to the deputies. Simpson did not try to run*

> *over the deputies as they describe. In fact, Simpson tried to avoid hitting the deputies by running the vehicle into a snow bank.*

*Ernie Burwell Expert Report, page 5. (See **Doc. 35.1**).*

15. Robinson believed that the driver of the vehicle intended to strike him with the vehicle. Simpson Video, Pt. 3 16:38:19.

*Disputed. As set forth in paragraph 14 above, no reasonable person in Robinson's position would have believed that Simpson intended to strike Robinson with the vehicle. Robinson admits that the video shows the vehicle was not attempting to strike him, but rather to go around him. Yellowstone County Doc. 195. (See **Doc. 33.2** p. 15). Detective Bancroft states that the video shows the vehicle going away from Robinson rather than at him. Yellowstone County Doc. 206 (See **Doc. 33.2** p. 19). Rudolph admits that the video shows the vehicle was attempting to go around Robinson. Yellowstone County Doc. 274-275. (See **Doc. 33.2** p. 29-30). Detective Fritz states that the video depicts Robinson firing from a 30 to 40 degree angle, rather than directly into the front of the vehicle. This demonstrates that the vehicle was not on a collision path with Robinson. Yellowstone County Doc. 69. (See **Doc. 33.2** p. 3). Finally, Expert Witness Ernie Burwell has reviewed the video and has opined that the vehicle was attempting to avoid hitting Robinson by driving into the snow bank on the side of the road. Ernie Burwell Expert Report, page 5. (See **Doc. 35.1**).*

16. Because Robinson believed that driver intended to strike him with the vehicle he believed that he was in threat of death or seriously bodily injury from the driver. He began to fire his military style semi-automatic rifle at the vehicle to protect himself.  Simpson Video, Pt. 3 16:38:20-21.

   *Disputed.  As set forth in paragraphs 14 and 15 above (which are incorporated herein by reference), no reasonable person in Robinson's position could have believed that the vehicle posed a threat of death or serious bodily injury to Robinson.  The video is clear and there is no question that the vehicle was not going to strike Robinson.*

17. Once Robinson began to fire his weapon, Rudolph began to fire his shotgun at the vehicle to protect Robinson, as Rudolph believed Robinson was in imminent danger of death or severe bodily harm from the suspect vehicle. Simpson Video, Pt. 3 16:38:22.

   *Disputed.  As set forth in paragraphs 14 and 15 above (which are incorporated herein by reference), no reasonable person in Rudolph's position would have believed that the vehicle was a danger to Robinson.  Rudolph has admitted that the video shows that the vehicle was not attempting to strike Robinson, but rather attempting to avoid hitting him.*

18. Within the next few seconds, Robinson and Rudolph fired numerous shots into the vehicle. Simpson Video, Pt. 3 16:38:22-25.

*Undisputed.*

19.  The vehicle swerved into a snow bank on the side of the road. The engine of the vehicle racing. Simpson Video, Pt. 3 16:38:25.

*Disputed as to the implication that the vehicle started to swerve towards the snow bank after Robinson and Rudolph fired on it. The video clearly shows the vehicle turning away from Robinson and Rudolph prior to Robinson's first shot. Simpson Video, Pt. 3 16:38:15 – 16:38:16 (See **Doc. 27**). After Robinson and Rudolph began firing at the vehicle, the front of the vehicle followed a straight path into the ditch/snowbank on the side of the road. Simpson Video, Pt. 3 16:38:16 – 16:38:18 (See **Doc. 27**).*

20.  Robinson and Rudolph waited a few seconds to make sure the vehicle did not back up before they approached the vehicle and turned off the vehicle. Simpson Video, Pt. 3 16:38:26-16:39:37.

*Disputed. There is no indication that the vehicle ever attempted to back up. Detective Fritz asked Robinson if the vehicle's reverse lights ever came on, and Robinson answered as follows:*

*Fritz: Did you ever see the reverse lights come on?*

*Robinson: No.*

*Fritz: So the wheels were spinning forward?*

*Robinson: Yeah.*

*Yellowstone County Doc. 203.  (See **Doc. 33.2** p. 16).  Detectives Bancroft and Fritz later verified that the reverse lights on the vehicle were operational. Yellowstone County Doc. 48.  (See **Doc. 33.2** p. 1).*

21. There was one person in the vehicle, later identified as Loren Simpson, and a dog.  Deputy Rudolph's Affidavit, ¶ 7; Deputy Robinson's Affidavit, ¶ 7.

    *Undisputed.*

22. They requested medical assistance. Simpson Video, Pt. 3 16:38:51.

    *Undisputed.*

23. Medical assistance arrived at the scene and pronounced Simpson dead. Deputy Rudolph's Affidavit, ¶ 7; Deputy Robinson's Affidavit, ¶ 7.

    *Undisputed.*

24. Robinson and Rudolph's vehicle had an audio video camera.  Simpson Video, Pt. 3 16:37:59-16:39:37.

    *Undisputed.*

25. The dashboard camera in the patrol vehicle recorded what occurred during the deputies' encounter with Simpson.  Simpson Video, Pt. 3 16:33:00.

    *Undisputed.*

26. There is no factual dispute as to what occurred.  The dashboard camera recorded what occurred.  Deputy Rudolph's Affidavit, ¶ 8; Deputy Robinson's Affidavit, ¶ 8.

*Undisputed as to the fact that the dashboard camera recorded the shooting, but disputed as to the implication that the parties agree regarding what the dashboard camera depicts. As set forth in paragraphs 14-15 above, which are incorporated herein by reference, the video of the shooting clearly depicts Simpson attempting to drive around Robinson and Rudolph, and no reasonable person in Robinson's position would have felt endangered by the vehicle.*

27. On January 8, 2015, during the afternoon, and while driving in his vehicle in Billings, Sheriff Linder heard the discussion on the radio between dispatch and Deputies Rudolph and Robinson about how they were following what they believed to be a stolen vehicle. When they declined the need for backup, Sheriff Linder decided to head in their direction in case they changed their minds. Sheriff Linder's Affidavit, ¶ 2 & ¶ 3.

    *Undisputed.*

28. When Sheriff Linder heard the call of "Shots fired" on the radio, Sheriff Linder informed dispatch he was on his way to the scene. Sheriff Linder's Affidavit, ¶ 3.

    *Undisputed.*

29. Sheriff Linder was the third person to arrive at the scene. Sheriff Linder's Affidavit, ¶ 4.

    *Undisputed.*

30. While at the scene, Sheriff Linder insured (sic) that detectives were on the way. Sheriff Linder's Affidavit, ¶ 4.

    *Undisputed.*

31. Sheriff Linder stood with both deputies while investigators went over the scene and they described what happened.

    *Undisputed.*

32. Within 24 hours of the shooting, Sheriff Linder viewed the dashboard camera video of the stop and shooting with his command staff.

    *Undisputed.*

33. Within 24 hours of the shooting, Sheriff Linder made a determination that the lack of use of acceptable police practices in the events leading up to the shooting were not in accord with the best practices of the Yellowstone County Sheriff's Office. Specifically, the canceling of cover and the walking out in front of the suspect vehicle. Sheriff Linder's Affidavit, ¶ 6.

    *Undisputed.*

34. Within 48 hours of the shooting, Sheriff Linder met with Yellowstone County Attorney Scott Twito and Deputy Yellowstone County Attorney Kevin Gillen to discuss the shooting. Sheriff Linder's Affidavit, ¶ 7.

    *Undisputed.*

35. Following that meeting and within three days of the shooting, Sheriff Linder made the determination to implement disciplinary proceedings against the two deputies for their tactics in setting up the high risk stop. Sheriff Linder's Affidavit, ¶ 7.

    *Undisputed*.

36. Sheriff Linder was not the person who informed the deputies of this decision. Sheriff Linder's Affidavit, ¶ 8.

    *Undisputed*.

37. Approximately one week after the shooting, and before any disciplinary proceedings had been formally initiated, both deputies turned in their resignations. Sheriff Linder's Affidavit, ¶ 9.

    *Undisputed*.

38. Both Deputy Rudolph and Deputy Robinson were P.O.S.T. (Public Safety Officer Standard Training) certified at the time of the shooting. Sheriff Linder's Affidavit, ¶ 10.

    *Undisputed*.

39. Both Deputy Rudolph and Deputy Robinson received training by the Yellowstone County Sheriff's Office in use of force. Deputy Rudolph's Affidavit, ¶ 9, Deputy Robinson's Affidavit, ¶ 9 & Sheriff Linder's Affidavit, ¶ 11.

*Undisputed.*

40. The training in use of force received by Deputy Rudolph and Deputy Robinson meets Constitutional requirements. Sheriff Linder's Affidavit, ¶12.

   *Disputed to the extent this paragraph sets forth a legal conclusion.*

41. The Yellowstone County Sheriff's office has no custom or practice of encouraging excessive use of force against the public. Deputy Rudolph's Affidavit, ¶ 10, Deputy Robinson's Affidavit, ¶ 10 & Sheriff Linder's Affidavit, ¶ 13.

   *Undisputed.*

   Dated this 21st day of December, 2016.

                              DATSOPOULOS, MacDONALD & LIND, P.C.

                              By: /s/ Nathan G. Wagner
                                    Nathan G. Wagner
                                    *Attorney for Plaintiffs*

## **CERTIFICATE OF SERVICE**

    I, Nathan G. Wagner, one of the attorneys for the law firm of Datsopoulos, MacDonald & Lind, P.C., hereby certify that on December 21, 2016, I served a true and correct copy of the foregoing document, postage prepaid, to the following by the following means:

| | |
|---|---|
| [ ] U.S. Mail | Mark A. English |
| [ ] FedEx | Kevin Gillen |
| [ ] Hand-Delivery | Deputy Yellowstone County Attorneys |
| [ ] Facsimile | Yellowstone County Courthouse, |
| [ ] Certified Mail, Return Receipt Requested | Room 701 |
| | P.O. Box 35025 |
| [ ] Email | Billings, MT  59107 |
| [x] ECF Electronic Filing | menglish@co.yellowstone.mt.gov |
| | kgillen@co.yellowstone.mt.gov |

    By:   /s/ Nathan G. Wagner
          Nathan G. Wagner
          *Attorney for Plaintiffs*