

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

ESTATE OF LOREN SIMPSON *et al*,

Plaintiffs,

vs.

YELLOWSTONE COUNTY, *et al*,

Defendants.

CV 15-99-BLG-SPW

OPINION AND ORDER

Loren Simpson's Estate, mother, sister, brother, and maternal grandmother
(hereinafter collectively referred to as "the Estate") brought this action against
Yellowstone County and Yellowstone County Deputies Chris Rudolph and Jason
Robinson alleging that the deputies used excessive force when they shot and killed
twenty-eight year old Simpson on January 8, 2015.

The deputies moved for summary judgment on the issue of qualified
immunity. The Estate filed an opposition brief and the deputies replied.[1] For the

---

[1] The Estate captioned its response as a "Cross Motion for Summary Judgment"
but failed to comply with D. Mont. L. R. 56.1(a). Moreover, qualified immunity
either exists or it doesn't; the deputies' motion for summary judgment resolves the
issue. Accordingly, the Estate's "cross motion" for summary judgment is denied
and is instead construed as a response. When the deputies filed their reply on
October 31, 2016, the motion was fully briefed.

following reasons, the deputies' Motion for Summary Judgment (Doc. 16) is GRANTED in part and DENIED in part. The deputies' Motion to Strike Reply to Response to Motion re Cross Motion for Summary Judgment (Doc. 41) is GRANTED.

## I.    Scope of the Court's Inquiry

As a preliminary matter, the court must address the nature of the relevant evidence. The shooting, and the moments before and after the shooting, were captured on cameras mounted on the deputies' patrol car dashboards. The videos form a large part of the record. (*See* Exhibit to Doc. 19 (found at Doc. 27), containing Simpson Video Parts 1-3; *see also* Doc. 35, Ex. 4 attached to *Pl's Statement of Disputed Facts* containing Leonhardt Video).

When videos capture the events in question, no genuine dispute of fact exists for anything that is clearly discernable in a videotape of the events at issue, even if sworn testimony in the record contradicts what the video shows. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007). However, when the videos fail to capture "everything," the court may consider supplemental evidence, including deposition testimony, so long as it is viewed in the light most favorable to the non-moving party. *Brosseau v. Haugen*, 543 U.S. 194, 195 (2004).

The deputies contend that the video footage provides everything the court needs to know to grant summary judgment. (See Doc. 23 at 14.) But while the

2

dash-cam videos show most of the relevant facts, they do not show them all. In this case evidence of the events leading up to the shooting is critical to the determination of what reasonable officers in the same situation would have done. Accordingly, the court will consider other evidence, including police and investigative reports, and statements, to supplement the videos. The facts, presented in the light most favorable to the Estate, as the nonmoving party, are set forth below.

## II.  Background

On January 8, 2015, Deputies Robinson and Rudolph were working day-shift patrol together. (*Robinson Case Report*, Doc. 33-2 at 7). Around 2:00 p.m., they were dispatched to Berry's Cherries, a used-car dealership, to investigate an auto theft. (*Id.* at 7). Dispatch described the stolen vehicle as a 1995 purple Ford Explorer without license plates. (*Rudolph Case Report*, Doc. 33-2 at 4).

According to Robinson's case report, the stolen vehicle's description matched the description of a suspicious vehicle call he and Rudolph had responded to earlier in the day at Rykken Circle, in another area of town. (*Robinson Case Report*, Doc. 33-2 at 7). After matching the VIN numbers with dispatch, Robinson and Rudolph decided to go to Rykken Circle before going to Berry's Cherries to see if they could find the Explorer. (*Id.*). After searching and not finding it, they drove to Berry's Cherries. (*Id.*).

3

There, manager Jerry Schuster told them that a 1995 purple Ford Explorer had been stolen from the lot. (*Id.* at 4, 7). Schuster said he had taken the Explorer in as a trade a couple of days earlier and when the previous owner had returned to collect her belongings, it was gone. (*Id.* at 7). The Explorer had been parked on the east side of the parking lot where no camera coverage existed. (*Id.*). Schuster said he thought he could sell the Explorer for about $1,000. (*Rudolph Case Report*, Doc. 33-2 at 4).

As the deputies were talking to Schuster, the Explorer's former owner showed up and said she had just seen the Explorer in the area of the Country Inn and Suites on Main Street in the Billings Heights. (*Id.*). She said it looked like a male with a scruffy brown beard was driving. (*Rudolph Case Report*, Doc. 33-2 at 4). When asked if the Explorer had any identifiable characteristics, the owner told the deputies that she thought it had a broken drivers' side headlight. (*Id.*). Robinson and Rudolph went to where the Explorer was last seen, as well as surrounding areas, but did not find it. (*Id.*).

According to Robinson's report, he thought Loren Simpson was possibly involved, given the possible connection to Rykken Circle. (*Robinson Case Report*, Doc. 33-2 at 7). Although the report does not provide any real detail about why Robinson suspected Simpson, he apparently knew that Simpson was often in that area and associated with someone who lived two trailers down from where the

4

Explorer had been parked. (*Id.*). The deputies drove to Simpson's residential address and a nearby Wal-Mart parking lot, but still saw no sign of the Explorer. (*Id.*). Robinson called Schuster and told him they were not able to find the Explorer. He also informed dispatch he and Rudolph were "clear," meaning that they were available to take other calls. (*Id.*).

Dispatch responded by advising Robinson and Rudolph of a burglary on Justice Trail. (*Rudolph Statement*, Doc. 33-2 at 24). According to Rudolph, the burglary was "cold" so the deputies did not feel any urgency to respond. (*Id.*) ("I think it was a cold burglary. Q: At that time you didn't feel any urgency to respond? A: No[.]"). So instead of heading directly to Justice Trail, they decided to drive by Rykken Circle again to check for the Explorer. (*Id.* at 23). Still not finding it, they headed out to handle the burglary call. (*Id.* at 23).

From Rykken Circle, they drove down Johnson Lane to Pryor Creek Road and turned on to White Buffalo Road. (*Id.* at 24). At around 4:20 p.m., while waiting for a school bus to unload children, they noticed a purple SUV pull out from Justice Trail on to White Buffalo Road. (*Rudolph statement*, Doc. 33-2 at 24). According to Rudolph's statement, he could not tell if the SUV was a two door or a four door and he had not seen it before. (*See id.*).[2] Despite the fact that

_____

[2] Nowhere in the record does either deputy identify the stolen Explorer as a two door or four door prior to seeing it on White Buffalo Road.

5

Rudolph didn't recognize the SUV, according to Robinson, both deputies agreed that it looked like the stolen Ford Explorer. (*Robinson Case Report*, Doc. 33-2 at 7). Accordingly, Rudolph advised dispatch that they had observed a vehicle that matched the description of the stolen Explorer and they intended to follow it before responding to the burglary. (*Id.*).

Deputy Joshua Leonhardt was dispatched to the burglary instead. (*See Leonhardt Case Report*, Doc. 33-2 at 5). Leonhardt's investigation revealed that the burglary was in fact a domestic dispute where a woman's husband stole a number of items from her home because he was mad at her. (*Id.*). Neither individual was involved with or related to this case. (*Id.*).

Meanwhile, however, Rudolph and Robinson deemed it likely that whoever was driving the Explorer was also involved in the burglary that had occurred hours earlier and that they had not yet investigated, so they followed the Explorer, "in order to observe the driver's behavior." (*Robinson Case Report*, Doc. 33-2 at 7). Robinson reported that they watched the Explorer from a distance and didn't turn on the patrol lights "or anything like that" because they wanted to see if it was the right car, in which case they wanted to make contact with it. (*Robinson statement*, Doc. 33-2 at 12). Two cars were between the patrol car and the Explorer. (*Id.*) In the video, when the deputies began following the Explorer, Rudolph asked

Robinson, without explanation, if he wanted his shotgun or his assault rifle. (*Simpson video Part 2* at 16:20:50-16:20:54, Doc. 27).

After following the Explorer for a few minutes, the road began to get steeper and the two cars in between the patrol car and the Explorer turned off White Buffalo Road. Robinson told Rudolph to get closer, "to make sure" it was the right car. (*Robinson statement*, Doc. 33-2 at 12). At that point however, according to Robinson, the Explorer started "pulling away." (*Id.*). From the video, it is apparent that the roads were snow-covered and the Explorer was already some distance in front of the deputies. (*Simpson video Part 2* at 16:21:40-16:22:07, Doc. 27).

A few minutes after they started following the Explorer, Robinson received a call from his supervising officer Joel Ketch. (*Id.* at 16:22:08). He can be heard telling Ketch that he and Rudolph were on White Buffalo Road and that the Explorer was headed into the hills. (*Id.* at 16:22:10-16:22:25). He told Ketch that he didn't know if they "[would] be able to catch 'em because the roads [were] turning to shit." (*Id.* at 16:22:27-16:22:33). He also told Ketch that he was "pretty sure" it was the right car, (*id.* at 16:23:40) and that the deputies were "right behind 'em." (*Id.* at 16:22:48). Nevertheless, neither deputy turned on the overhead lights or siren in an attempt to stop the Explorer. (*Id.* at 16:19:43-16:24:57). Inconsistent with his statement to Ketch that the deputies were right behind the

7

Explorer, in Robinson's post-shooting statement he explained that he and Rudolph did not attempt to conduct a traffic stop at that time because Simpson "was too far away," and was "running." (*Robinson statement*, Doc. 33-2 at 12).

In the video, as the deputies accelerated up the hill, the patrol car became bogged down in the snow. (*Simpson Video Part 2* at 16:23:00, Doc. 27). Robinson can be heard telling Ketch that the patrol car was stuck in the snow, they couldn't go forward, and that Rudolph was backing the patrol car down the hill. (*Id.* at 16:23:08). Robinson told Ketch that he couldn't "see shit" and that he wasn't "even 100% sure it's the car." (*Id.* at 16:23:34-16:23:37). He ended the call with Ketch and contacted dispatch to advise that they were stuck and needed a four wheel drive vehicle. (16:24:30-16:24:40). He also advised that they had "lost sight of the suspect vehicle." (16:24:36-16:24:37). The first video then ends.

Not long after the patrol car became stuck in the snow, another vehicle with teenagers heading home from school stopped and helped free the patrol car from the snow. (*Robinson report*, Doc. 33-2 at 7). Instead of parking the patrol car in one of the plowed driveways nearby, however, Rudolph parked the patrol car in the center of the road where it was "unlikely to get stuck again." (*Leonhardt Video* 16:41:40-16:42:15, Doc. 35). Meanwhile, Robinson discovered from one of the teens that White Buffalo Road was a dead-end so whomever was driving the Explorer would have to come back down the road toward the officers to get out.

8

(*Robinson report*, Doc. 33-2 at 7). Robinson took down the teenager's cell phone number, sent him up the road, and asked him to keep a look out for the Explorer. (*Id.*). He told the teen he would call him to see if he had seen the Explorer up the road. (*Id*).

Now knowing that White Buffalo Road was a dead-end, the deputies determined that they had the Explorer driver "bottled up." (*Rudolph Statement*, Doc. 33-2 at 20, "We've got him bottled up."). Believing that they had "him caught," they decided they would stay where they were instead of going back to the main road, Pryor Creek. (*Id.*).

The second video begins while the deputies are waiting for the Explorer to come back to them. (*Simpson Video Part 2* at 16:31:39, Doc. 27). Rudolph can be heard telling Robinson that he sent Leonhardt and Ketch a message that there was "only one way in." (*Id.* at 16:32:48-52). Robinson next called the teenager and confirmed that the Explorer was headed back down the hill towards the deputies. (*Id.* at 16:34:57-16:35:16).

Despite not knowing who was driving the Explorer, whether it contained any passengers, and having no reason to believe the driver was armed, (*Yellowstone County's Discovery Responses*, Request for Admission No. 3, Doc. 33-3 at 4), the deputies decided that "since the suspect was in a stolen vehicle and possibly involved in a recent burglary," they should "have rifles at the ready, just in case

9

[the suspect] decided to do anything drastic." (*Robinson Case Report*, Doc. 33-2 at 7). They did not discuss any plan, including whether they should let the Explorer pass and then effect a standard traffic stop. Rather, they kept the patrol car parked in the middle of the road. (*Simpson Video Part 2* at 16:31:39-16:38:40, Doc. 27). Neither deputy activated the patrol car's headlights or overhead lights. (*Id.*). Robinson apparently requested that dispatch send Deputy Leonhardt to their location "for cover" because "the more the better in these kind of situations." (*Robinson statement*, Doc. 33-2 at 14). Neither Robinson nor Rudolph asked Deputy Leonhardt about any suspects involved in the burglary. (*Simpson Video Part 2* at 16:31:39-16:38:40, Doc. 27).

Instead, after Robinson told Rudolph "it's coming back toward us right now," Rudolph asked Robinson how to release Robinson's shotgun from its rack in the patrol car, and then loaded it. (*Id.* at 16:35:23-16:36:03) (*Robinson Case Report*, Doc. 33-2 at 7 ("Rudolph grabbed Robinson's 12-gauge shotgun out of the gun rack in the patrol car.")). Robinson can be heard retrieving his AR-15 assault rifle from the trunk and loading 18 rounds into the magazine. (*Id.*) (*Simpson video Part 2* at 16:36:50, Doc. 27).

According to Robinson, he told Rudolph "to be ready, because the Explorer was returning," at which point Rudolph loaded three rounds of slugs into the shotgun. (*Robinson Case Report*, Doc. 33-2 at 7). Robinson loaded a round into

10

the chamber of his rifle. (*Id.*). In the video, Rudolph told Robinson he has three

slugs ready. (*Simpson video Part 2* at 16:36:50, Doc. 27). Robinson saw the

Explorer coming down the hill and told Rudolph "here he comes." (*Id.* at

16:37:59). Rudolph then told dispatch to standby. (*Id.* at 16:37:56-16:37:59).

Still, neither deputy activated the siren, headlights, or the overhead lights, before

stepping out of the patrol car. And neither stayed in the car to demand over the

loudspeaker that Simpson stop. (*Id.* at 16:38:02-16:38:04).

In the video, as the Explorer comes down the hill, it does not appear to be

traveling at a high rate of speed. (*Id.* at 16:38:00-16:38:15). Robinson and

Rudolph can be heard getting out of the patrol car. (*Id.* at 16:38:02-16:38:04).

Robinson appears first on screen, on the passenger side of the patrol car, walking

toward the Explorer with his assault rifle in the ready position, pointed down at a

45 degree angle. (*Id.* at 16:38:09). Rudolph comes into view next, also walking

toward the Explorer, but with his shotgun aimed at the vehicle. (*Id.* at 16:38:10).

Both deputies walk up the middle of the road toward the Explorer. (*Id.* at

16:38:10-16:38:11).

Two seconds after Robinson comes into view, he yells at the Explorer to

stop while simultaneously raising his assault rifle and taking aim at the Explorer.

(*Simpson video Part 2* at 16:38:11, Doc. 27). Robinson later reported that the

driver appeared to be a male wearing sunglasses. (*Robinson Case Report,* Doc. 33-

11

2 at 7). Neither Rudolph nor Robinson offered any other identifying information. Nor did they indicate whether the Explorer had a broken drivers' side headlight or had license plates.

During the four seconds between the time the deputies come into view and the first shot is fired, the Explorer appears to slow down and veer left, away from the deputies as it approaches them. (*Simpson video Part 2* at 16:38:12-16:38:12, Doc. 27). Robinson and Rudolph continue walking toward the Explorer with their weapons aimed. They can be heard yelling, "stop" and "shut it down." (*Id.* at 16:38:11-16:38:15). They do not warn Simpson that they will shoot. (*Id.*)

According to Robinson, the Explorer accelerated and headed towards him. (*Robinson statement*, Doc. 33-2 at 10: "I saw the wheels spin and I saw the front end of the car come for me and I knew that if I didn't stop him he was gonna kill me."). In reality, however, the Explorer veered further left, away from Robinson, towards the side of the road. (*Id.* at 16:38:15-16:38:18) (*see also Robinson statement,* Doc. 33-2 at 15: "I'm watching the video it looks like he's trying to drive past me.") (*See also Rudolph statement,* Doc. 33-2 at 30: "Yeah it looks like he could have been going around us."). As Simpson veers left to avoid Robinson, both deputies also walk left, tracking toward the Explorer. (*Simpson video Part 2* at 16:38:15-16:38:18, Doc. 27). Six seconds after coming into the dashcam's view, Robinson walks into the Explorer's path and begins firing at it with his

assault rifle. (*Id.* at 16:38:16). Immediately, Rudolph also begins firing with his shotgun. (*Id.* at 16:38:17).

The Explorer passes Robinson and begins to slide and the back end swings around as the front end runs into the snowbank. (*Id.* at 16:38:16-16:38:19). Robinson, still firing, steps back to avoid the Explorer's back end. In doing so, he comes into Rudolph's line of fire and Rudolph pulls his weapon up to avoid shooting Robinson. (*Id.* at 16:38:18). The deputies continue firing their weapons into the back of the Explorer after it passes them and lodges in the snowbank. (*Id.* at 16:38:18:23). Both empty their magazines. (*Id.* at 16:44:04-16:4407, Doc. 27) (Doc. 33-2 at 7). One of the shots, fired by Robinson, entered the back of Simpson's neck, severed his brainstem, and killed him. (Doc. 33-2 at 31).

After emptying his assault rifle, Robinson drew his sidearm and continued yelling at the Explorer. (*Simpson video, Part 2* at16:44:04-16:44:07, Doc. 27). Rudolph returned to the patrol car and advised dispatch, "shots fired," and requested medical assistance. (*Id.* at 16:38:53-16:38:56). The Explorer's tires continued to spin and Rudolph advised Robinson to turn the car off. In response, Robinson approached the Explorer and turned it off. (*Id.* at 16:39:17-16:39:37). Rudolph returned to the patrol car and activated the overhead lights. (*Id.* at 16:40:07). He advised dispatch that a dog was in the car and that the suspect was

13

dead. (*Id.* at 16:40:12-16:40:20) ("Suspect is 10-7"). Robinson then told Rudolph "good call on the rifle." (*Id.* at 16:41:04).

A few minutes later, Deputy Leonhardt arrived. Rudolph told Leonhardt that he was "pretty sure" this was the guy from "the [burglary] down the street." (*Id.* at 16:42:23-26). He also identified the Explorer as the stolen vehicle. (*Id.* at 16:42:23); (Doc. 33-2 at 3). Rudolph told Leonhardt that he and Robinson were "outside challenging [Simpson] and he gave it the goose." (*Simpson video Part 2* at 16:42:48-16:42:50, Doc. 27). Robinson agreed and stated "he gave it the gas and came right at us." (*Id.* at 16:42:52-16:42:54).

Approximately five minutes after the shooting, Rudolph verified that the Explorer was the stolen vehicle from Berry's Cherries. (*Id.* at 16:42:23); (Doc. 33-2 at 3) ('Rudolph can be heard telling Deputy Leonhardt that he was "pretty sure this is our guy from the B and E from down the street though. And that's our stolen car.'") None of the stolen items from the burglary were found in the Explorer. (*Michaelis Report*, Doc. 33-2).

Subsequently, Detective Frank Fritz appeared on the scene to collect evidence. (*Investigative report excerpt*, Doc. 33-2 at 2). He walked south on White Buffalo Road for approximately a quarter of a mile, but found no evidence on the road that Simpson spun the Explorer's wheels and accelerated at the deputies. (*Id.*). He took pictures of the suspect's body in the driver's seat and

14

noted that Simpson had a pair of sunglasses laying in his lap. (*Id.*). Detective Fritz stated that "over the course of several days of viewing the video it did not appear []
that the suspect's vehicle increased its speed as it approached the deputies." (Doc. 33-2 at 3).

## II.   Legal Standard

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party and a dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson,* 477 U.S. at 249-50. The court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson,* 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.,* 504 F.3d 1017, 1020-21 (9th Cir.

15

2007). The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.

## III.  Discussion

### A.  Qualified Immunity – Federal Claims

Where a plaintiff states a valid cause of action under 42 U.S.C. § 1983, government officials sued in their individual capacities may raise the affirmative defense of qualified immunity. *Mullenix v. Luna*, ____ U.S. ____, 136 S. Ct. 305, 308 (2015).  Qualified immunity protects government officials from civil liability so long as the officers' conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 308.

Deciding whether a government official is entitled to qualified immunity is a two-step inquiry. *Id.*  First, the court must ask whether the facts, viewed in the light most favorable to the non-moving party, establish a Fourth Amendment violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the court determines that the officer did not violate any constitutional rights, the analysis stops because there is no constitutional violation for which qualified immunity is needed. *Id.*  If the answer is yes, however, then the court must ask whether the law governing the claim was clearly established at the time of the violation. *Id.*  If the court concludes that this second inquiry is also answered in the affirmative, the officer is

not entitled to qualified immunity. *Davis v. City of Las Vegas*, 478 F.3d 1048, 1053 (9th Cir. 2007).

"A district court should decide the issue of qualified immunity as a matter of law when the material, historical facts are not in dispute, and the only disputes involve what inferences properly may be drawn from those historical facts." *Conner v. Heiman*, 672 F.3d 1126, 1131 (9th Cir. 2012) (internal quotations omitted). Thus, when factual disputes exist on issues necessary to decide the issue of qualified immunity for excessive force, summary judgment is appropriate only if the defendants are entitled to qualified immunity on the facts as alleged by the non-moving party. *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007).

Turning to this case, the Court must address two questions: (1) whether Deputies Robinson and Rudolph violated Loren Simpson's constitutional rights, and if so, (2) whether those rights were clearly established at the time of the shooting.

## 1. Whether the Deputies Violated Simpson's Rights

Here, the Estate alleges that the deputies violated Simpson's rights under the Fourth Amendment. "A Fourth Amendment claim of excessive force is analyzed under the framework outlined by the Supreme Court in *Graham v. Connor*." *Davis,* 478 F.3d at 1054. Under *Graham*, "*all* claims that law enforcement officers

17

have used excessive force - deadly or not - in the course of an arrest, investigatory stop, or other seizure ... should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id.* at 1053-54 (quoting *Graham*, 490 U.S. at 390) (citation omitted) (emphasis in original). This analysis must be "an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

Under Ninth Circuit law, "[a]n officer's use of deadly force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (emphasis omitted) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985); *see also Gonzalez v. City of Anaheim,* 747 F.3d 789, 794 (9th Cir. 2014). The Ninth Circuit has also held that an officer must give a warning before using deadly force "whenever practicable." *Gonzalez,* 747 F.3d at 794 (quoting *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997)).

In determining whether a particular use of force was unreasonable and thus violates the Fourth Amendment, courts must balance the force used against the plaintiff against the governmental interests at stake. *Davis*, 478 F.3d at 1054. Whether the level of the government's interest justifies the force used is evaluated by examining three primary factors from *Graham*: (1) the severity of the crime at

18

issue; (2) whether the suspect presents an immediate threat to the officer or to public safety; and (3) whether the suspect is actively resisting or evading arrest. *Hughes v. Kisela*, 841 F.3d 1081, 1085 (9th Cir. 2016) (citing *Graham*, 490 U.S. at 396).

Courts are also free to consider other factors, whether or not specifically set out in *Graham*, including the availability of less intrusive force, *Kisela,* 841 F.3d at 1085, whether the officer warned the individual prior to using force, *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994), and whether the officer considered the existence of feasible alternatives to capture or subdue a suspect. *Bryan v. MacPherson*, 630 F.3d 805, 831 n.15 (9th Cir. 2010). When considering these factors, the court may not rely on hindsight, and instead must judge the officer's conduct from the "perspective of a reasonable officer on the scene." *Id.* at 396.

Here, considering the *Graham* factors, and viewing the facts in the light most favorable to the Estate, and consistent with the video footage, *Scott v. Harris*, 550 U.S. 372, 380 (2007), the record does not support the deputies' perception of an immediate threat to their safety or the safety of third parties. The analysis begins by assessing the quantum of force used against Simpson. *See Davis,* 478 F.3d at 1055 (stating that the *Graham* factors and other factors are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure). The deputies shot at Simpson at least twenty-four times.

(*Ernest Burwell Report,* Doc. 33-1: 24 shells recovered at the scene). In other words, the deputies used the most severe kind of force available. *Garner,* 471 U.S. at 9 ("The intrusiveness of a seizure by means of deadly force is unmatched.").

Next, the Court must weigh the governmental interest at stake to see if it justifies deadly force. The Court begins with the "most important" *Graham* factor: whether Simpson posed a threat to the officers. *See Gonzalez,* 747 F.3d at 806. The deputies argue that they shot Simpson because Simpson veered his vehicle toward Robinson in an apparent attempt to hit him, contending that "ample" cases provide that an officer may use deadly force against the driver of a vehicle when the vehicle poses a risk of death or serious bodily injury. (Doc. 36 at 10, 13); *see, e.g., Plumhoff v. Rickard,* 134 S.Ct. 2012, 2018 (2014).

The deputies' characterization of the case law is correct. In *Plumhoff,* for example, the Supreme Court held that an officer acted reasonably when he fatally shot a fugitive who was "intent on resuming" a chase that "pose[d] a deadly threat for others on the road." 572 U.S. at ——, 134 S.Ct. at 2022. But in order to accept the deputies' assertion that their actions were objectively reasonable under *Plumhoff* as a matter of law, one would have to accept, as a matter of fact, that Simpson was accelerating and driving the Explorer towards Robinson as the deputies yelled at him to stop. That is not what the video shows. Nor does any other evidence support that theory.

20

Both deputies testified that they were concerned for Robinson's safety when they fired their weapons. Nonetheless, "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Kisela*, 841 F.3d at 1086; *see also Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001) ("A desire to resolve quickly a potentially dangerous situation is not the type of government interest that, standing alone, justifies the use of force that may cause serious injury.").

Here, the video reveals that Simpson drove the Explorer *away* from Robinson, not toward him, a fact that both Robinson and Rudolph conceded after viewing the video. *(See* Doc. 33-2 at 15, Robinson statement, "I'm watching the video it looks like he's trying to drive past me."); *(see also* Doc. 33-2 at 30, Rudolph statement: "Yeah it looks like he could have been going around us."). In the video, Simpson drives the same measured rate of speed down the hill, Robinson walks into the Explorer's path as it attempts to go around him, and there is no indication that Simpson accelerated towards Robinson. The video contents are corroborated by the fact that in the subsequent internal investigation into the shooting, law enforcement did not find any evidence that Simpson accelerated towards the deputies either. (Doc. 33-2 at 3).

On top of that, once it left the road and passed the deputies, the Explorer did not move forward or back, nor did the reverse lights come on, but the deputies

21

continued firing. One of these shots, fired by Deputy Robinson, killed Simpson.
Although officers need not necessarily evaluate whether a deadly threat has been
eliminated after the firing of each shot in a close encounter, *Wilkinson v. Torres,*
610 F.3d 546, 552 (9th Cir. 2010), they are required to consider new information
regarding a passing threat. *Waterman v. Batton,* 393 F.3d 471, 482 (4th Cir. 2005).
Here, Robinson himself testified that he kept firing after Simpson had passed him
because he was "locked into the target" and it "just hadn't occurred to [him] to stop
yet," not because he believed he was in danger. (Doc. 33-2 at 17). And this
incident happened in a rural area in cold weather where no other persons were
present to whom Simpson could have posed a danger assuming he was fleeing.
Viewed in the light most favorable to the Estate, these facts, as in *Waterman*,
suggest that it was not objectively reasonable for the deputies to believe that
Simpson was accelerating and driving the Explorer towards Robinson or to keep
firing at the Explorer after it passed them.

In short, the video and other objective evidence demonstrates that Simpson
did not pose a threat to the deputies or anyone else, not as he tried to drive around
the deputies and certainly not after he passed them. As such, a rational jury could
find the deputies' use of deadly force was unreasonable.

Turning to the next *Graham* factor, the severity of Simpson's purported
offenses "provides [ ] little, if any basis for [the deputies'] use of physical force."

*Bryan*, 630 F.3d at 828. According to the deputies, they were attempting to stop Simpson to determine whether the Explorer was stolen. (Doc. 36 at 5). At the time of the stop, they knew the stolen Explorer was worth approximately $1,000, so they knew the crime they were investigating was a misdemeanor in Yellowstone County, *see* Mont. Code Ann. 45-6-301(8)(a); a crime they describe as "relatively minor[.]" (Doc. 36 at 5).

While "the commission of a misdemeanor offense is not to be taken lightly, it militates against finding the force used to effect an arrest reasonable where the suspect was also nonviolent and posed no threat to the safety of the officers or others." *Bryan*, 630 at 828-29. Here, the deputies only suspected Simpson had committed a crime. And that suspicion appears to have been tenuous at best. Prior to setting up a roadblock without even turning on the patrol car's overhead lights, Robinson admitted to his supervising officer that he wasn't "even 100% it [was the right] car." (Doc. Simpson video, Pt. 2, 16:23-30-16:23:40). And although they argue that "misuse" of a stolen vehicle can cause "serious bodily injury or death to others," neither deputy had any information that Simpson was "misusing" the vehicle, or even suspected him of doing so.

The deputies had not observed Simpson driving recklessly nor had he led them on a high speed chase. *Cf. Scott*, 550 U.S. at 386 (deadly force reasonable when a police officer is attempting to terminate a dangerous high speed car chase

23

that threatens the lives of innocent bystanders); *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007) (deadly force reasonable when driver's reckless disregard for the safety of those around him posed a threat to everyone in the vicinity). They did not suspect he was armed and there is no evidence they believed he was under the influence of alcohol or drugs, thereby rendering his crime inherently dangerous or violent. (Doc. 33-5, Request for Admission No. 3); *Cf. Parker v. Gerrish*, 547 F.3d 1, 9 (1st Cir. 2008) ("Though driving while intoxicated is a serious offense, it does not present a risk of danger to the arresting officer that is presented when an officer confronts a suspect engaged in an offense like robbery or assault.").

In fact, in light of the suspected nature of the crime, no substantial government interest existed for using *any* force to effect Simpson's arrest for this misdemeanor violation. *See Kisela*, 841 F.3d at 1086 ("The character of the offense is often an important consideration in determining whether the use of force was justified, and where the crime being committed, if any, was minor and the danger to . . . others appear to have been minimal, the governmental interest in using force was clearly not substantial."); *Bryan,* 630 F.3d at 831 ("[M]isdemeanors are relatively minor and will generally not support the deployment of significant force."). Courts have found less force unwarranted for greater crimes. In *Davis*, trespassing and obstructing a police officer did not justify

slamming defendant head-first into a wall, throwing him on the floor, kneeing him in the back and punching him in the face. 478 F.3d at 1055. Similarly in *Smith v. City of Hemet*, a domestic violence incident where a husband was physically abusing his wife did not warrant slamming defendant into a wall, pepper spraying him, and instructing a police dog to attack. 394 F.3d 689, 693 (9th Cir. 2005). Simply put, the force here far exceeds that found unreasonable in *Davis* and *Smith* with seemingly far less justification.

Under the third *Graham* factor, Simpson did not actively resist arrest. The question that will never be answered is whether Simpson even knew the deputies were attempting to stop him. As the Estate points out, it was dusk and Simpson was wearing sunglasses which would have impaired Simpson's ability to see the deputies as he approached. Furthermore, the deputies failed to activate the overhead lights on the patrol car to alert Simpson to their presence, that they were law enforcement officers, and they wanted him to stop. Finally, it was winter, so chances are that Simpson, like every other citizen in Montana, had his car windows up and his heater on, greatly diminishing his ability to hear any shouting. All that is to say, viewing the facts in the light most favorable to the Estate, a jury could find that Simpson was not fleeing and that he simply did not see or hear the deputies until the last second at which time he veered into the barrow pit to avoid

hitting them and their patrol car. Accordingly, this factor also weighs in the Estate's favor.

Considering other factors, it is clear that the deputies could have used less extreme force to conduct an investigative stop to determine the identity of the driver and whether the Explorer was stolen. The deputies had not observed Simpson speeding, driving recklessly, or doing anything other than legally driving down a snow covered road. The deputies did not know if the Explorer was indeed the stolen vehicle, and they did not know if the driver was the individual who had stolen the suspected stolen vehicle.

According to both the Estate's expert and the Yellowstone County Sheriff's Office Policy Manual (YCSO Manual), the easiest way to make both determinations would have been to simply let Simpson pass and pull him over. The deputies could have signaled Simpson with the patrol car's overhead lights and sirens to pull over, figured out whether the vehicle was actually stolen, and arrested him if the circumstances warranted arrest. (*Burwell report*, Doc. 33-1 at 9). Under these circumstances, failing to initiate a standard traffic stop and opting instead for an emergency road-block, which is described as force likely to cause death by YCSO Manual, was unreasonable. *See Kisela*, 841 F.3d at 1085 (With respect to the possibility of less intrusive force, officers need not employ the least intrusive means available but must act within a range of reasonable conduct). It

was a misdemeanor, after all. *See Miller*, 340 F.3d at 967 (determining that another less forceful means of arrest includes signaling at the suspect with emergency lights and sirens).

In sum, the force used by the deputies was severe, the crime they suspected Simpson had committed was minor, the danger to the deputies was minimal, and the deputies could have used less intrusive means to effect the investigative stop. Thus, viewing the evidence in the light most favorable to the Estate, and weighing the severity of the force used against the governmental interests at stake, a jury could conclude that Simpson was not an immediate threat to the deputies or others at the time he was shot and killed, or even if he posed a threat, that the deputies' response to that threat was unreasonable and violated Simpson's Fourth Amendment rights.

## 2. Clearly Established Right

Because a constitutional violation has been found, the next step in the qualified immunity analysis is to ask "whether the right was clearly established . . . in light of the specific context of the case." *Saucier*, 533 U.S. at 202. A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. *Mullenix,* 136 S.Ct. at 308. Although a case "directly on point" is not required, existing

precedent must have placed the statutory or constitutional question beyond debate. *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Clearly established law may not be defined at a high level of generality. *al-Kidd*, 563 U.S. at 742. The correct inquiry is whether the law, at the time of the incident, clearly established that the Fourth Amendment prohibited the officer's conduct in the situation he confronted. *Mullenix*, 136 S. Ct. at 309. "Such specificity is especially important in the Fourth Amendment context, where the Supreme Court has recognized that it can be "difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (internal citations and quotations omitted).

Here, armed with a shotgun and an assault rifle, Robinson and Rudolph set up an emergency road-block in the middle of a rural road using their patrol car, at dusk in the wintertime, on a snow-covered road, without activating the patrol car's overhead lights, to stop a suspected stolen vehicle valued at $1,000. The relevant inquiry is whether existing precedent placed the conclusion "beyond debate" that Rudolph and Robinson acted unreasonably in these circumstances. *Mullenix,* 136 S.Ct. at 309. The answer, given these circumstances, is yes.

As discussed above, claims of excessive force by police officers are judged pursuant to the Fourth Amendment's reasonableness standard. *Graham*, 490 U.S. at 388. The Supreme Court has explained that it is unreasonable for an officer to

"seize an unarmed, nondangerous suspect by shooting him dead." *Garner*, 471

U.S. at 11. On the other hand, "[w]here the officer has probable cause to believe

that the suspect poses a threat of serious physical harm, either to the officer or to

others, it is not constitutionally unreasonable to prevent escape by using deadly

force." *Id.* at 11. Because *Graham* and *Garner* "are cast at a high level of

generality," however, these standards do not, except in "an obvious case," provide

fair warning to a police officer that is necessary to defeat a claim of qualified

immunity. *Mullenix*, 136 S.Ct. at 310.

As the Supreme Court explained in *Mullenix,* situations such as high speed

chases and felons fleeing arrest require officers to take actions somewhere "in the

hazy border between excessive and acceptable force." *Id* at 312. This hazy border

consists of varying factors like the existence of innocent bystanders, threats to

officers, a suspect's intoxication or mental incapacitation, an armed suspect,

general public safety and the severity of the suspect's crime, among others. *See*

*e.g. Kisela*, 841 F.3d at 1086; *Graham*, 490 U.S. at 386; *Plumhoff,* 134 S.Ct. at

2018. Thus, the specificity requirement serves to protect the officers and to allow

them to make judgment calls in highly vulnerable, sometimes dangerous situations,

without fear of being sued. *See Mullenix,* 136 S. Ct. at 309 ("It would be

unreasonable to expect a police officer to make the numerous legal conclusions

necessary to apply *Garner* to a high-speed car chase . . . .) (quoting *Pasco v. Knoblauch,* 566 F.3d 572, 580 (5th Cir. 2009)).

The distinction here, is that this is not a fleeing case, or a high-speed chase, or anything remotely comparable. Unlike law enforcement in *Mullenix, Garner, Kisela,* and *Plumhoff,* Rudolph and Robinson were not confronted with the hazy border between excessive force and force appropriate to effect Simpson's arrest, because they had no legal basis for arrest. Indeed, Rudolph and Robinson did not even have probable cause to arrest Simpson.

Simpson was not suspected of committing a felony or any violent crime, he had not led the deputies on a high speed chase, the deputies did not think he was armed, and he was not driving dangerously. Instead, Rudolph and Robinson merely suspected the Explorer that Simpson was driving was stolen. They knew the color, and had identified the number of doors. But even then, they admittedly were not sure whether it was the right car or one that just looked like the stolen Explorer. And, they had no idea who was driving the car. So, as Simpson was driving back toward them on White Buffalo Road, all Rudolph and Robinson had was reasonable suspicion that the vehicle was stolen.

As a result, 40 years of law provided them with the authority only to conduct a *Terry* stop in order to determine whether criminal activity was afoot. *See Terry v. Ohio,* 392 U.S. 1 (1968); *United States v. Sokolow,* 109 S.Ct. 1581, 1586 (1989)

(determination of reasonable suspicion for an investigative stop is the degree of suspicion that attaches to particular types of noncriminal acts). To that end, the deputies admitted that they attempted to stop Simpson to determine whether the vehicle he was driving had been stolen. (Doc. 36 at 5). What makes this case quite distinct from all of the cases relied upon by the parties is Rudolph and Robinson never attempted a proper stop. They immediately used deadly force.

Knowing that Simpson had "no way out," they parked the patrol car in the middle of the road and did not turn on the patrol car's overhead lights which would have given Simpson advance notice of the deputies' presence.[3] Then, without discussing any less deadly alternative for stopping Simpson, they loaded their weapons, stepped onto a snow covered road with those weapons aimed, shouted at a man inside a moving car with its windows up, gave no warning they would shoot, allowed him four seconds to try to stop under these highly questionable circumstances on a snowy road, and then shot him. And all this where the video demonstrates that they did not have cause to believe Simpson posed a threat to them.

---

[3] The Estate's expert, Ernest Burwell, pointed out that proper police procedure provides that emergency roadblocks to apprehend suspects should be used "only after other reasonable alternatives have been exhausted," (*id.* at 8 (citing YCSO Manual)), and that when the patrol car is parked in position, it should be parked "at such an angle that [it] reveals the Sheriff's office emblem on the door [with] . . . emergency lights activated." (*Id.* at 9 (citing YCSO manual)). The patrol car was parked straight ahead.

Even without the benefit of pre-existing court decisions, any reasonable officer would recognize that using deadly force to effect a *Terry* stop violates clearly established law. Regardless, the deputies had the benefit of long-standing case law. According to established Ninth Circuit law, in a typical *Terry* stop where an officer has no reason to suspect danger, it is a Fourth Amendment violation for an officer to employ aggressive tactics such as drawing a weapon, forcing a suspect to lie prone on the ground, and using handcuffs. *United States v. Del Vizo,* 918 F.2d 821, 825 (9th Cir. 1990). Such tactics transform the *Terry* stop into an arrest. *Id.* at 824. In fact, the Ninth Circuit has long recognized that "[w]here there is no need for force, *any* force used is constitutionally unreasonable." *Headwaters Forest Defense v. County of Humbolt,* 240 F.3d 1185, 1199 (9th Cir. 2000).

That law is dispositive here. If it is well-established that officers may not so much as use handcuffs or draw a weapon to effectuate a *Terry* stop, it is axiomatic that they may not use deadly force to do so. When law enforcement illegally attempts an arrest, the "countervailing government interest" required by *Graham* is absent. No level of force is justified in such circumstances. Given the clarity of Ninth Circuit law on the use of force in *Terry* stops, every reasonable officer would have known that the deputies' conduct violated the Fourth Amendment in light of the specific context of this case. Thus, viewing the facts in the light most favorable

to the Estate, Rudolph and Robinson are not entitled to qualified immunity on the excessive force claim.

## B.    State Statutory Immunity – State Claims

The Estate concedes summary judgment on these claims.

## III.   Conclusion

For the above stated reasons, the Court GRANTS Defendant's motion (Doc. 16) for summary judgment on the Estate's state law claims but DENIES Defendant's motion for summary judgment on qualified immunity.

Based on this Order, Plaintiff's Cross-Motion for Summary Judgment (Doc. 31) is DENIED as moot. Also, Defendant's Motion to Strike Reply to Response to Motion for Cross Motion for Summary Judgment (Doc. 41) is GRANTED.

DATED this _24th_ day of January, 2017.

SUSAN P. WATTERS
United States District Judge